1

2

3

4

5                   UNITED STATES BANKRUPTCY COURT

6                          DISTRICT OF OREGON

7  *In re*

8  JAMES JOEL HOLMAN and CANDICE          Case No.  14-35381-rld7
   EVANGELINE HOLMAN,
9
                    Debtors.
10

11 DWIGHT and LAURA DANIELS,              Adversary Proceeding No. 14-03285-rld
   husband and wife,
12                                        **DECLARATION OF DARIAN**
                    Plaintiffs,           **STANFORD IN SUPPORT OF**
13 v.                                     **PLAINTIFFS' RESPONSE BRIEF IN**
                                          **OPPOSITION TO DEFENDANTS'**
14 JAMES JOEL HOLMAN and CANDICE          **MOTION FOR PARTIAL SUMMARY**
   EVANGELINE HOLMAN,                     **JUDGMENT**
15
                    Defendants.
16

17     I, Darian Stanford, declare as follows:

18     1.      I am one of the attorneys representing Dwight and Laura Daniels, Plaintiffs, in the

19 above captioned lawsuit.

20     2.      Attached hereto as Exhibit 1 are true and accurate copies of portions of the

21 deposition of Candice Holman, taken on July 7, 2015.

22     3.      Attached hereto as Exhibit 2 is a true and accurate copy of the Promissory Note

23 executed by James and Candice Holman, dated February 24, 2001.

24     4.      Attached hereto as Exhibit 3 is a true and accurate copy of the Deed of Trust for

25 Defendants' personal residence at 26280 Mill Creek Circle executed by both James and Candice

26  Page 1 – DECLARATION OF DARIAN STANFORD        **SLINDE NELSON STANFORD**
                                                   111 SW 5th Avenue, Suite 1940
                                                   Portland, Oregon 97204
                                                   p. 503.417.7777; f. 503.417.4250

1   Holman.

2        5.       Attached hereto as Exhibit 4 is a true and accurate copy of an assignment of the

3   life insurance policy of James Holman signed by James Holman and acknowledged by Candice

4   Holman.

5        6.       Attached hereto and marked Exhibit 5 is a true and accurate copy of the Personal

6   Financial Statement given to the Plaintiffs by the Defendants.

7        I HEREBY DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE

8   BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE

9   FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

10       DATED this 17th day of July, 2015.

11

12                                              SLINDE NELSON STANFORD

13

                                                By: _____

14                                                  Darian A. Stanford, OSB No. 994491

15

16

17

18

19

20

21

22

23

24

25

26  Page 2 – DECLARATION OF DARIAN STANFORD

SLINDE NELSON STANFORD
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON


In re:

JAMES JOEL HOLMAN, CANDICE

EVANGELINE HOLMAN,

   Debtors,

       Case No. 14-35381-rld7

_____

DWIGHT DANIELS, LAURA DANIELS,

   Plaintiffs,

  vs.

JAMES JOEL HOLMAN,

CANDICE EVANGELINE HOLMAN,

   Defendants.

_____


DEPOSITION OF CANDICE EVANGELINE HOLMAN

Volume 1, Pages 1 to 44

Taken on behalf of the Plaintiffs

Tuesday, July 7, 2015

1   actually, let me follow up on that.

2              Was it your understanding that the company was

3   having financial problems in 2011?

4        A.   No.

5        Q.   Okay.  Did you know one way or the other or

6   was it your understanding the company was fine?

7        A.   Yeah, it was fine.

8        Q.   Okay.  Your husband and I talked a little bit

9   about officers in various companies.

10             Were you ever an officer in any of the

11  companies that you and your husband had?

12       A.   Not that I remember, no.

13       Q.   There was a piece of paper that lists -- I

14  think it said "SEC" next to your name.

15             Do you remember being the secretary of any

16  company?

17       A.   I don't.

18       Q.   Let me show you that.  It's Exhibit 7.  It's

19  an assignment of a life insurance policy.  I want you to

20  take a look at it.

21             First of all, do you see your signature on the

22  first page down at the bottom?

23       A.   Yes.

24       Q.   Which one?

25       A.   The one on the right.

1          Q.    If you were made an officer of one of the

2    companies, would you know?

3          A.    No.

4          Q.    While we're looking at documents, I'm going to

5    show you these as well.  I'll show you what's called

6    Exhibit 2.  It's a promissory note.

7                Can you tell me whether or not your signature

8    is on that one?

9          A.    Yes.

10         Q.    Go ahead and hold that for a second.  Here's

11   3, same question, is that your signature?

12         A.    Yes.

13         Q.    Okay.  Can you tell me, ma'am, why you signed

14   those two documents?

15         A.    No.

16         Q.    Did your husband ask you to sign them?

17         A.    Yes.

18         Q.    When you signed those documents, were you

19   aware of what they were or what they did?

20         A.    No.

21         Q.    Did you ask your husband to explain them to

22   you?

23         A.    No.

24         Q.    You just signed them where he told you to sign

25   them?

1       A.    Yes.

2       Q.    Okay.  By no means am I denigrating you in any

3    way by asking you this question, but was that common in the

4    business?  Did you just sign what your husband asked you to

5    sign?

6       A.    Yes.

7       Q.    You said a moment ago -- I'm jumping around a

8    little bit on you -- that it was your understanding that

9    the loan was for the business, right?

10       A.    Yes.

11       Q.    How did you come to that understanding?

12       A.    Because that's what James had shared with me

13    that they had talked about.

14       Q.    Got it.

15            Prior to talking with the Daniels, were you

16    aware that Mr. Holman was looking for a loan?

17       A.    I don't remember that.

18       Q.    You don't remember any conversations about

19    that?

20       A.    No.

21       Q.    At some point, it sounds like you two had a

22    conversation that Mr. Holman had been put in touch with the

23    Daniels.  Correct?

24       A.    Yes.

25       Q.    Tell me about that.  What did he tell you?

1       A.    Yes.

2       Q.    Mill Creek?

3       A.    Yes.

4       Q.    Are you on the title for that home?

5       A.    I don't know.

6       Q.    Did you ever, to your knowledge, have any

7  ownership interest in any of the companies we talked about

8  today, ITG, PCS, any of those?

9             MR. HEATHERMAN:  Do you understand his

10 question?

11            THE WITNESS:  No.

12            MR. HEATHERMAN:  Can you define "ownership

13 interest" or rephrase it?

14            MR. BITNER:  Sure.

15

16 BY MR. BITNER: (Continuing)

17      Q.    Let's take PCS for a moment.  Was PCS 100

18 percent owned by Mr. Holman?  Did he own the entire company

19 or did he have partners?

20      A.    Well, I think I was his partner.

21      Q.    That's kind of the question I was asking.

22      A.    Okay.

23      Q.    I'm wondering if there was any kind of

24 agreement out there, any piece of paper or anything like

25 that, that said this company is owned 50 percent by A or B

1   or anything like that.  I'm wondering if you had any formal

2   ownership interest in any of the companies.  That's what I

3   mean by ownership interest.

4               Does that make sense?

5        A.   Yes, possibly.

6        Q.   Okay.

7        A.   I can't say what.

8        Q.   Were you ever paid any money by any of the

9   companies?

10       A.   No.

11       Q.   Okay.  I had asked your husband earlier during

12  this whole loan process if he had counsel to represent

13  anyone.  He identified Mr. Mitchell.

14              Do you know Mr. Mitchell?

15       A.   Yes.

16       Q.   Did you ever have any conversations with him?

17       A.   No.

18       Q.   And I apologize I just asked you this, but my

19  brain is slipping outside my head right now.

20              Did you and your husband talk about the terms

21  of the loan?

22       A.   Not that I remember.

23       Q.   Okay.  For example, do you remember your

24  husband ever telling you, Hey, we're putting up the house

25  against this loan?

1      MR. HEATHERMAN:  This would have been prior to

2   February or any time?

3      MR. BITNER:  I'm being broad here, to be

4   honest with you.

5      MR. HEATHERMAN:  He's asking at any time.

6      MR. BITNER:  Thank you.  I'll clarify it a

7   little bit.

8

9   BY MR. BITNER: (Continuing)

10      Q.   There were -- you heard me and your husband

11   talk about this.  There were conversations and machinations

12   that went on prior to the loan being issued, We're going to

13   do this for security, this for security.

14         Did you have any conversations with Mr. Holman

15   or the Daniels or anyone regarding what was going to be

16   used as security for this loan prior to issuance?

17      A.   Just James.

18      Q.   Okay.  What did you two talk about?  What did

19   you find out?

20      A.   Honestly, I don't remember exactly what we

21   discussed.

22      Q.   You remember --

23      A.   I just --

24      Q.   Sorry.  Go ahead.

25      A.   It's okay.  Go ahead.

1      Q.   I told you I'd interrupt you eventually.

2           Do you remember him telling you that the house

3   was being put up against the loan?

4      A.   Vaguely.

5      Q.   Okay.  Do you remember him telling you about

6   any of the company's assets being put up against the loan?

7      A.   No.

8      Q.   There's a bunch of documents -- well, begging

9   the obvious, you had seen the promissory note and the trust

10  deed because you signed them, correct?

11     A.   Yes.

12     Q.   Okay.  Did you actually ever read those?

13     A.   No.

14     Q.   To date?  To today?

15     A.   No.

16     Q.   Okay.  Your husband and I talked about a UCC

17  filing statement that's Exhibit 4.  Had you ever seen that?

18     A.   No.

19     Q.   To today?

20     A.   No.

21     Q.   Okay.  Ever have any conversations with your

22  husband about a UCC financing statement?

23     A.   No.

24     Q.   Or Mr. Mitchell?

25     A.   No.

Case 14-03285-rld   Doc 26   Filed 07/17/15

25

1   something I asked you a moment ago, and that was whether or

2   not you had any familiarity with UCC-1s or know anything

3   about them.  You said no.

4           There was testimony earlier from your husband

5   that the four of you -- by the four of you, I mean you two

6   and the two Daniels -- had a conversation around May 2013

7   about all of this.

8           Do you remember that conversation?

9           A.   I remember speaking with them, but honestly, I

10  can't tell you what was said.

11          Q.   Okay.  Do you remember, were you engaged in

12  that conversation or were you just listening?

13          A.   Just listening, I believe.  I -- I don't know

14  that I said anything.

15          Q.   Okay.  I know you said you don't remember

16  everything that was talked about.  Do you remember any

17  discussions about a UCC-1?

18          A.   No.

19          Q.   With the understanding that you had not seen

20  Exhibit 8 and partial Exhibit 1, the personal financial

21  statement that your -- your husband did not show it to you,

22  correct?

23          A.   Right.

24          Q.   Are you familiar with the form at all?

25          A.   No.

1          Q.    Do you ever remember filling out an

2    application for a loan or any kind of lending?

3          A.    No.

4          Q.    Do you remember ever signing documents --

5    other than the ones we're talking about here today, signing

6    any other loan agreements or documents for lending?

7          A.    No.

8          Q.    By that, I mean promissory notes and that kind

9    of thing, same kind of document.

10         A.    No, I don't.

11         Q.    Same answer?

12         A.    Correct.

13         Q.    Do you agree with me -- and I can show it to

14   you again.  Do you agree with me, ma'am, that you're listed

15   as a co-applicant on this statement?

16         A.    Yes.

17         Q.    Do you have any idea what that means?

18         A.    100 percent, no.

19         Q.    Okay.  What do you think it means even if it's

20   30 percent?

21         A.    That we -- that I am applying with him.

22         Q.    Okay.  You heard us talk about a lot of

23   e-mails today back and forth between Mr. Daniels and

24   Mr. Holman.

25               Did Mr. Holman ever run any of those e-mails

42

1    Were you involved in any other way with all of this?

2          A.   No.

3          Q.   You did understand as of February 2011 that

4    the Daniels were lending not only Mr. Holman, but you as

5    well, $300,000, right?

6          A.   I don't know exactly when.

7          Q.   Okay.

8          A.   But, yes.

9          Q.   Okay.  So that it was -- although you

10   testified earlier that it was your understanding that it

11   was for the business pursuant to a conversation with your

12   husband, the money was actually loaned to the two of you?

13         A.   Right.

14         Q.   Okay.

15              MR. BITNER:  That's all I've got.  Thank you

16   very much.

17              (Deposition adjourned at 3:38 p.m.)

18

19

20

21

22

23

24

25

43

```
1   STATE OF OREGON            )

2                              )  ss

3   COUNTY OF MULTNOMAH        )

4

5        I, Heather M. Ingram, Certified Shorthand Reporter for

6   the State of Oregon, do hereby certify that CANDICE

7   EVANGELINE HOLMAN personally appeared before me at the time

8   and place mentioned in the caption herein; that the witness

9   was by me first duly sworn under oath and examined upon

10  oral interrogatories propounded by counsel; that said

11  examination, together with the testimony of said witness,

12  was taken down by me in stenotype and thereafter reduced to

13  typewriting; and, that the foregoing transcript, pages 1

14  through 42, both inclusive, constitutes a full, true and

15  accurate record of said examination of and testimony by

16  said witness, and of all other oral proceedings had during

17  the taking of said deposition, and of the whole thereof.

18       Witness my hand at Portland, Oregon, this 13th day of

19  July, 2015.

20

21       _____

22       Heather M. Ingram

23       Oregon CSR No. 93-0279

24       Washington CSR No. 2188

25
```

# EXHIBIT 2

# SECURED PROMISSORY NOTE

$300,000.00

Portland, OR
February 24, 2011

For value received, James J Holman and Candice E Holman located at 26280 S Milk Creek Circle, Mulino, OR 97042 ("Borrower"), hereby unconditionally promises to pay to the order of Dwight E Daniels and Laura J Daniels located at 23 Carmel Bay Drive, Corona Del Mar, CA 92625 ("Lender"), at such place as Lender may from time to time designate in writing, the principal amount of Three Hundred Thousand Dollars ($300,000), in lawful money of the United States of America, with interest and fees as provided below, from the date hereof, until paid.

1.  Principal. The principal amount of this note ("Note") is Three Hundred Thousand Dollars ($300,000).

2.  Interest.

    2.1  Rate. Borrower promises to pay interest on the outstanding principal balance of this Note at the rate of ten percent (10%) per annum from the date hereof until paid. Interest shall be computed on the basis of a 360-day year for the actual number of days preceding payment.

    2.2  Loan Fee. Borrower will pay a one time loan fee of Six Thousand Dollars ($6,000) upon commencement of this note.

3.  Payment.

    3.1  Interest. Accrued interest shall be paid monthly with a due date on the first of every month.

    3.2  Maturity. All principal and any unpaid accrued interest, together with any sums due under this note to Lender under the terms of any Security Instrument securing repayment of this Note, shall be due and payable on April 1, 2014.

    3.3  Repayment. Payments shall be interest only for thirty six (36) months in the amount of two thousand five hundred dollars ($2,500) per month The principal amount shall be paid in full on the maturity date. All payments shall be applied first to interest in arrears, then to reduction of principal, provided, however, Lender may apply any payments received to other obligations of Borrower under the Security Instrument securing repayment of this Note.

    3.4  Prepayment. This Note may be prepaid without penalty at any time by paying only the entire principal balance and accrued interest, and any other sums due under the terms of the Security Instrument given to secure repayment of this Note.

3.5　Late Payment. Any payment made more than fifteen (15) days late shall be assessed a late payment fee of 10%.

4.　Security. The indebtedness evidenced by this Note is secured by Borrower's execution and performance of the Deed of Trust attached as Exhibit 1 ("Security Instrument"). Any amounts due from Borrower to Lender under the terms of the Security Instrument shall be considered additional unpaid principal under this Note.

5.　Waiver by All Parties. Borrower and all persons liable or to become liable on this Note: waive notice of acceptance, presentment, protest and demand, and all notices including, without limitation, notice of non-payment, default, dishonor, and demand of this Note; consent to any and all renewals and extensions in the time of payment hereof.

6.　Miscellaneous.

6.1　Governing Law, Venue. This Note shall be governed by and construed in accordance with the laws of the State of Oregon. The undersigned agrees that in any suit or action hereon venue will lie in the County of Clackamas and State of Oregon, without waiver, however, of Lender's right to lay venue in any other county or state appropriate for the collection of this Note.

6.2　Usury. In the event this Note should for any reason be found to be in violation of any state or federal statutes relating to usury, Lender may reduce the interest rate on this Note to the legal maximum as provided for by law or regulation and by so doing be relieved of any civil liability.


_____
James J Holman

_____
Candice E Holman



SECURED PROMISSORY NOTE
PAGE 2 OF 3

4P
20 ad'l
5

FORM No. 881-1 – TRUST DEED (No restriction on assignment). © 1990-2009 STEVENS-NESS LAW PUBLISHING CO., PORTLAND, OR www.stevensness.com

EA NO PART OF ANY STEVENS-NESS FORM MAY BE REPRODUCED IN ANY FORM OR BY ANY ELECTRONIC OR MECHANICAL MEANS.

# TRUST DEED

James J. Holman & Candice E. Holman
26260 S. Milk Creek Circle
Mulino, OR 97042
Grantor's Name and Address

Dwight E. Daniels & Laura J. Daniels
22 Carmel Bay Drive
Corona Del Mar, CA 92625
Beneficiary's Name and Address

After recording, return to (Name, Address, Zip):
Todd Mitchell
Bullivant Houser Bailey PC
806 Broadway, Ste 400
Vancouver, WA 98660

STATE OF OREGON,

Clackamas County Official Records
Sherry Hall, County Clerk
2011-013147
$82.00
01477693201100131470040043
02/28/2011 08:14:43 AM
M-TD Cnt=1 Stn=1 JANISKEL
$20.00 $16.00 $16.00 $10.00 $20.00

By ________________________, Deputy.

THIS TRUST DEED, made on February 15, 2011, between James J. Holman and Candice E. Holman, as Grantor, ~~Dwight E. Daniels and Laura J. Daniels~~ Ticor Title, as Trustee, and Dwight E. Daniels and Laura J. Daniels, as Beneficiary,

WITNESSETH:

Grantor irrevocably grants, bargains, sells and conveys to trustee, in trust, with power of sale, the property in Clackamas County, Oregon, described as:

Lot 5, Milk Creek Meadows, in the County of Clackamas and State of Oregon.

together with all and singular the tenements, hereditaments and appurtenances and all other rights thereunto belonging or in any way now or hereafter appertaining, and the rents, issues and profits thereof, and all fixtures now or hereafter attached to or used in connection with the property.

FOR THE PURPOSE OF SECURING PERFORMANCE of each agreement of grantor herein contained and payment of the sum of $300,000 with interest thereon according to the terms of a Secured Promissory Note Dated 2/24/10 Dollars, with interest thereon according to the terms of a promissory note of even date herewith, payable to beneficiary or order and made by grantor, the final payment of principal and interest, if not sooner paid, to be due and payable on April 1, 2014.

The date of maturity of the debt secured by this instrument is the date, stated above, on which the final installment of the note becomes due and payable.

To protect the security of this trust deed, grantor agrees:

1. To protect, preserve and maintain the property in good condition and repair; not to remove or demolish any building or improvement thereon; and not to commit or permit any waste of the property.

2. To complete or restore promptly and in good and habitable condition any building or improvement which may be constructed, damaged or destroyed thereon, and pay when due all costs incurred therefor.

3. To comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the property; if the beneficiary so requests, to join in executing such financing statements pursuant to the Uniform Commercial Code as the beneficiary may require, and to pay for filing the same in the proper public office or offices, as well as the cost of all lien searches made by filing officers or searching agencies as may be deemed desirable by the beneficiary.

4. To provide and continuously maintain insurance on the buildings now or hereafter erected on the property against loss or damage by fire and other hazards, as the beneficiary may from time to time require, in an amount not less than $ 300,000, written by one or more companies acceptable to the beneficiary, with loss payable to the latter. All policies of insurance shall be delivered to the beneficiary as soon as issued. If the grantor shall fail for any reason to procure any such insurance and to deliver the policies to the beneficiary at least fifteen days prior to the expiration of any policy of insurance now or hereafter placed on the buildings, the beneficiary may procure the same at grantor's expense. The amount collected under any fire or other insurance policy may be applied by beneficiary upon any indebtedness secured hereby and in such order as beneficiary may determine, or at option of beneficiary the entire amount so collected, or any part thereof, may be released to grantor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

5. To keep the property free from construction liens and to pay all taxes, assessments and other charges that may be levied or assessed upon or against the property before any part of such taxes, assessments and other charges become past due or delinquent and promptly deliver receipts therefor to beneficiary. Should the grantor fail to make payment of any taxes, assessments, insurance premiums, liens or other charges payable by grantor, either by direct payment or by providing beneficiary with funds with which to make such payment, beneficiary may, at its option, make payment thereof, and the amount so paid, with interest at the rate set forth in the note secured hereby, together with the obligations described in paragraphs 6 and 7 of this trust deed, shall be added to and become a part of the debt secured by this trust deed, without waiver of any rights arising from breach of any of the covenants hereof. For such payments, with interest as aforesaid, the property hereinbefore described, as well as the grantor, shall be bound to the same extent that they are bound for the payment of the obligation herein described. All such payments shall be immediately due and payable without notice, and the nonpayment thereof shall, at the option of the beneficiary, render all sums secured by this trust deed immediately due and payable and shall constitute a breach of this trust deed.

6. To pay all costs, fees and expenses of this trust, including the cost of title search, as well as the other costs and expenses of the trustee incurred in connection with or in enforcing this obligation, and trustee and attorney fees actually incurred.

7. To appear in and defend any action or proceeding purporting to affect the security rights or powers of beneficiary or trustee; and in any suit, action or proceeding in which the beneficiary or trustee may appear, including any suit for the foreclosure of this deed or any suit or action related to this instrument, including but not limited to its validity and/or enforceability, to pay all costs and expenses, including evidence of title and the beneficiary's or trustee's attorney fees. The amount of attorney fees mentioned in this paragraph in all cases shall be fixed by the trial court, and in the event of an appeal from any judgment or decree of the trial court, grantor further agrees to pay such sum as the appellate court shall adjudge reasonable as the beneficiary's or trustee's attorney fees on such appeal.

It is mutually agreed that:

8. In the event that any portion or all of the property shall be taken under the right of eminent domain or condemnation, beneficiary shall have the right, if it so elects, to require that all or any portion of the monies payable as compensation for such taking which are in excess of the amount required to pay all reasonable costs, expenses and attorney fees necessarily paid or incurred by grantor in such proceedings, shall be paid to beneficiary and applied by it first upon any reasonable costs and expenses and attorney fees, both in the trial and appellate courts, necessarily paid or incurred by beneficiary in such proceedings, and the balance applied upon the indebtedness secured hereby. Grantor agrees, at its own expense, to take such actions and execute such instruments as shall be necessary in obtaining such compensation promptly upon beneficiary's request. (OVER)

NOTE: The Trust Deed Act provides that the trustee hereunder must be either an attorney who is an active member of the Oregon State Bar, a bank, trust company or savings and loan association authorized to do business under the laws of Oregon or the United States, a title insurance company authorized to insure title to real property of this state, its subsidiaries, affiliates, agents or branches, the United States or any agency thereof, or an escrow agent licensed under ORS 696.505 to 696.585.



9. At any time, and from time to time upon written request of beneficiary, payment of its fees and presentation of this deed and the note for endorsement (in case of full reconveyance, for cancellation), without affecting the liability of any person for the payment of the indebtedness, trustee may (a) consent to the making of any map or plat of the property; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this deed or the lien or charge thereof; or (d) reconvey, without warranty, all or any part of the property. The grantee in any reconveyance may be described as the "person or persons legally entitled thereto," and the recitals therein of any matters or facts shall be conclusive proof of the truthfulness thereof. Trustee's fees for any of the services mentioned in this paragraph shall be not less than $5.

10. Upon any default by grantor hereunder, beneficiary may, at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of the property or any part thereof, in its own name sue or otherwise collect the rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as beneficiary may determine.

11. The entering upon and taking possession of the property, the collection of such rents, issues and profits, or the proceeds of fire and other insurance policies or compensation or awards for any taking or damage of the property, and the application or release thereof as aforesaid, shall not cure or waive any default or notice of default hereunder, or invalidate any act done pursuant to such notice.

12. Upon default by grantor in payment of any indebtedness secured hereby or in grantor's performance of any agreement hereunder, time being of the essence with respect to such payment and/or performance, the beneficiary may declare all sums secured hereby immediately due and payable. In such event the beneficiary may elect to proceed to foreclose this trust deed in equity as a mortgage or direct the trustee to foreclose this trust deed by advertisement and sale, or may direct the trustee to pursue any other right or remedy, either at law or in equity, which the beneficiary may have. In the event the beneficiary elects to foreclose by advertisement and sale, the beneficiary or the trustee shall execute and cause to be recorded a written notice of default and election to sell the property to satisfy the obligation secured hereby whereupon the trustee shall fix the time and place of sale, give notice thereof as then required by law and proceed to foreclose this trust deed in the manner provided in ORS 86.735 to 86.795.

13. After the trustee has commenced foreclosure by advertisement and sale, and at any time prior to 5 days before the date the trustee conducts the sale, the grantor or any other person so privileged by ORS 86.753 may cure the default or defaults. If the default consists of a failure to pay, when due, sums secured by the trust deed, the default may be cured by paying the entire amount due at the time of the cure other than such portion as would not then be due had no default occurred. Any other default that is capable of being cured may be cured by tendering the performance required under the obligation or trust deed. In any case, in addition to curing the default or defaults, the person effecting the cure shall pay to the beneficiary all costs and expenses actually incurred in enforcing the obligation of the trust deed, together with trustee and attorney fees not exceeding the amounts provided by law.

14. Otherwise, the sale shall be held on the date and at the time and place designated in the notice of sale or the time to which the sale may be postponed as provided by law. The trustee may sell the property either in one parcel or in separate parcels and shall sell the parcel or parcels at auction to the highest bidder for cash, payable at the time of sale. Trustee shall deliver to the purchaser its deed in form as required by law conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in the deed of any matters of fact shall be conclusive proof of the truthfulness thereof. Any person, excluding the trustee, but including the grantor and beneficiary, may purchase at the sale.

15. When trustee sells pursuant to the powers provided herein, trustee shall apply the proceeds of sale to payment of: (1) the expenses of sale, including the compensation of the trustee and a reasonable charge by trustee's attorney, (2) to the obligation secured by the trust deed, (3) to all persons having recorded liens subsequent to the interest of the trustee in the trust deed as their interests may appear in the order of their priority and (4) the surplus, if any, to the grantor, or to any successor in interest entitled to such surplus.

16. Beneficiary may, from time to time, appoint a successor or successors to any trustee named herein or to any successor trustee appointed hereunder. Upon such appointment, and without conveyance to the successor trustee, the latter shall be vested with all title, powers and duties conferred upon any trustee herein named or appointed hereunder. Each such appointment and substitution shall be made by written instrument executed by beneficiary, which, when recorded in the mortgage records of the county or counties in which the property is situated, shall be conclusive proof of proper appointment of the successor trustee.

17. Trustee accepts this trust when this deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which grantor, beneficiary or trustee shall be a party unless such action or proceeding is brought by trustee.

The grantor covenants and agrees to and with the beneficiary and the beneficiary's successors in interest that the grantor is lawfully seized in fee simple of the real property and has a valid, unencumbered title thereto, except as may be set forth in any addendum or exhibit attached hereto, and that the grantor will warrant and forever defend the same against all persons whomsoever.

WARNING: Unless grantor provides beneficiary with evidence of insurance coverage as required by the contract or loan agreement between them, beneficiary may purchase insurance at grantor's expense to protect beneficiary's interest. This insurance may, but need not, also protect grantor's interest. If the collateral becomes damaged, the coverage purchased by beneficiary may not pay any claim made by or against grantor. Grantor may later cancel the coverage by providing evidence that grantor has obtained property coverage elsewhere. Grantor is responsible for the cost of any insurance coverage purchased by beneficiary, which cost may be added to grantor's contract or loan balance. If it is so added, the interest rate on the underlying contract or loan will apply to it. The effective date of coverage may be the date grantor's prior coverage lapsed or the date grantor failed to provide proof of coverage. The coverage beneficiary purchases may be considerably more expensive than insurance grantor might otherwise obtain alone and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.

The grantor warrants that the proceeds of the loan represented by the above described note and this trust deed are (choose one): *

(a) primarily for grantor's personal, family or household purposes (see Important Notice below),

(b) for an organization, or (even if grantor is a natural person) are for business or commercial purposes.

This deed applies to, inures to the benefit of and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, personal representatives, successors and assigns. The term beneficiary shall mean the holder and owner, including pledgee, of the contract secured hereby, whether or not named as a beneficiary herein.

In construing this trust deed, it is understood that the grantor, trustee and/or beneficiary may each be more than one person; that if the context so requires, the singular shall be taken to mean and include the plural, and that generally all grammatical changes shall be made, assumed and implied to make the provisions hereof apply equally to corporations and to individuals.

IN WITNESS WHEREOF, the grantor has executed this instrument the day and year first written above.

*IMPORTANT NOTICE: Delete, by lining out, whichever warranty (a) or (b) is inapplicable. If warranty (a) is applicable and the beneficiary is a creditor as such word is defined in the Truth-in-Lending Act and Regulation Z, the beneficiary MUST comply with the Act and Regulation by making required disclosures; if compliance with the Act is not required, disregard this notice.

_Carolee Holman_ (signature)

STATE OF OREGON, County of __Clackamas__ ) ss.

This instrument was acknowledged before me on __February 25, 2011__
by __James J. Holman & Carolee E. Holman__.

by _____

This instrument was acknowledged before me on _____

by _____

OFFICIAL SEAL
VICKI V ADAMSON
NOTARY PUBLIC - OREGON
COMMISSION NO. 442204
MY COMMISSION EXPIRES SEPTEMBER 13, 2013

_Vicki J. Adamson_ (signature)
Notary Public for Oregon
My commission expires __09/13/13__

REQUEST FOR FULL RECONVEYANCE (To be used only when obligations have been paid.)

TO: _____, Trustee

The undersigned is the legal owner and holder of all indebtedness secured by the foregoing trust deed. All sums secured by the trust deed have been fully paid and satisfied. You hereby are directed, on payment to you of any sums owing to you under the terms of the trust deed or pursuant to statute, to cancel all evidences of indebtedness secured by the trust deed (which are delivered to you herewith together with the trust deed) and to reconvey, without warranty, to the parties designated by the terms of the trust deed, the estate now held by you under the same. Mail the reconveyance and documents to _____

DATED _____

Do not lose or destroy this Trust Deed OR THE NOTE which it secures. Both should be delivered to the trustee for cancellation before reconveyance is made.

_____, Beneficiary

2

# EXHIBIT 4

Form No. 10— LIFE INSURANCE ASSIGNMENT

# ASSIGNMENT OF LIFE INSURANCE POLICY AS COLLATERAL

A.   For Value Received the undersigned hereby assign, transfer and set over to *Dwight F. Daniels* *Laurie S. Daniels* of (address) *73 Carmel Bay Dr, Carmel Del Mar, CA 92625* its successors and assigns, (herein called the "Assignee") Policy No. *L18 007890* issued by

☐ AXA Equitable Life Insurance Company    ☐ MONY Life Insurance Company of America

(herein called the "Insurer") and any supplementary contracts issued in connection therewith (said policy and contracts being herein called the "Policy"), upon the life of *James I. Holman*

of *Sulpress Restraunt Grup.* and all claims, options, privileges, rights, title and interest therein and thereunder (except as provided in Paragraph C hereof), subject to all the terms and conditions of the Policy and to all superior liens, if any, which the Insurer may have against said Policy. The undersigned by this instrument jointly and severally agree and the assignee by the acceptance of this assignment agrees to the conditions and provisions herein set forth.

B.   It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this assignment and pass by virtue hereof:
   1. The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity;
   2. The sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the Policy and at such other times as the Insurer may allow;
   3. The sole right to obtain one or more loans or advances on the Policy, either from the Insurer or, at any time, from other persons, and to pledge or assign the Policy as security for such loans or advances;
   4. The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto; provided, that unless and until the Assignee shall notify the Insurer in writing to the contrary, the distributions or shares of surplus, dividend deposits and additions shall continue on the plan in force at the time of this assignment; and
   5. The sole right to exercise all nonforfeiture rights permitted by the terms of the Policy or allowed by the Insurer and to receive all benefits and advantages derived therefrom.

C.   It is expressly agreed that the following specific rights, so long as the Policy has not been surrendered, are reserved and excluded from this assignment and do not pass by virtue hereof:
   1. The right to collect from the Insurer any disability benefit payable in cash that does not reduce the amount of insurance;
   2. The right to designate and change the beneficiary;
   3. The right to elect any optional mode of settlement permitted by the Policy or allowed by the Insurer; but the reservation of these rights shall in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this assignment and to the rights of the Assignee hereunder.

D.   This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

E.   The Assignee covenants and agrees with the undersigned as follows:
   1. That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this assignment not been executed;
   2. That the Assignee will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums) the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any premium when due, nor until twenty days after the Assignee shall have mailed, by first-class mail, to the undersigned at the addresses last supplied in writing to the Assignee specifically referring to this assignment, notice of intention to exercise such right; and
   3. That the Assignee will upon request forward without unreasonable delay to the Insurer the Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement.

F.   The Insurer is hereby authorized to recognize the Assignee's claims to rights hereunder without investigating the reason for any action taken by the Assignee, or the validity or the amount of the Liabilities or the existence of any default therein, or the giving of any notice under Paragraph E (2) above or otherwise, or the application to be made by the Assignee of any amounts to be paid to the Assignee. The sole signature of the Assignee shall be sufficient for the exercise of any rights under the Policy assigned hereby and the sole receipt of the Assignee for any sums received shall be a full discharge and release therefor to the Insurer. Checks for all or any part of the sums payable under the Policy and assigned herein, shall be drawn to the exclusive order of the Assignee if, when, and in such amounts as may be, requested by the Assignee.

G.   The Assignee shall be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Policy whether or not obtained by the Assignee, or any other charges on the Policy, but any such amounts so paid by the Assignee from its own funds, shall become a part of the Liabilities hereby secured, shall be due immediately, and shall draw interest at a rate fixed by the Assignee from time to time not exceeding 6% per annum.

H.   The exercise of any right, option, privilege or power given herein to the Assignee shall be at the option of the Assignee, but (except as restricted by Paragraph E (2) above) the Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by the undersigned, or any of them.

I.   The Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities in such order as the Assignee shall determine, the proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this assignment, without resorting or regard to other security.

J.   In the event of any conflict between the provisions of this assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment shall prevail.

K.   Each of the undersigned declares that no proceedings in bankruptcy are pending against him and that his property is not subject to any assignment for the benefit of creditors.

Signed and sealed this *8* day of *August* 20 *11*

_____                          *E.V. Cran    Sec.*    (L.S.)
                    Witness                                              Owner [Full Name]

*3601 Sw Mc (Thurman) Blvd*                          *12934 SE Capp Rd.*
Street No.          City          State    Zip Code        Street No.        City        State      Zip Code
*Portland, OR 99219*                                  *C. Mckamal, OR 97015*

_____
                    Witness

_____
Street No.          City          State    Zip Code        Street No.        City        State      Zip Code
153-00921 A                                                             Cat. #125107E (9/08)

## Individual Acknowledgment

STATE OF_____
                         }ss.:
COUNTY OF_____

On the _____ day of _____ 20____, before me personally came _____

_____, to me known to be the individual ____ described in and who

executed the assignment on the reverse side hereof and acknowledged to me that _____ he _____ executed the same.

_____
Notary Public

My commission expires _____

## CORPORATE ACKNOWLEDGMENT

STATE OF *Oregon*
                         }ss.:
COUNTY OF *Multnomah*

On the *8* day of *August* 20 *11*, before me personally came _____

*Candice Evangelista*, who being by me duly sworn, did depose and say that he resides in *Oregon*

that he is the *Secretary* of *Integrity Trust Co.* the corporation described in and which executed the assignment on the reverse side hereof; that he knows the seal of said corporation; that the seal affixed to said assignment is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation, and that he signed his name thereto by like order.

*Gwendolyn Ann Abernathy*
Notary Public

My commission expires *11/14/2011*

OFFICIAL SEAL
GWENDOLYN ANN ABERNATHY
NOTARY PUBLIC-OREGON
COMMISSION NO. 421164
MY COMMISSION EXPIRES NOVEMBER 14, 2011

NOTE: When executed by a corporation, the corporate seal should be affixed and there should be attached a certified copy of the Resolution of the Board of Directors authorizing the signing officer to execute and deliver the assignment in the name and on behalf of the corporation.

AXA EQUITABLE LIFE INSURANCE COMPANY HAS
RECORDED AND FILED THIS DOCUMENT, DATED AT
CHARLOTTE
8/19/2011

*Cynthia Reese*

Case 14-03285-rld    Doc 26    Filed 07/17/15

EXHIBIT 5

# PERSONAL FINANCIAL STATEMENT

**COLUMBIA**

| | | | |
|---|---|---|---|
| Applicant Name | James/Candice Holman | Home Phone | 503/829-3100 |
| Street Address | 26280 S Milk Creek Circle | Business Phone | 503/553-0030 |
| City, State, Zip | Mulino, OR 97042 | Date of Birth | May 20, 1968 |

Applicant is applying for this loan:
[x] Individually, without a co-signor or guaranty of a relative or other person (s) or entity
[x] Jointly, with the co-signature or guaranty of one or more persons or entities (including existing guarantors)
(if jointly, name other person or entity) _____

Applicant is: married / separated / unmarried (single, divorced and widowed)     Married
Co-Applicant is: married / separated / unmarried (single, divorced and widowed)

Financial Condition as of (Date): **February 1, 2011**

| ASSETS | | | | LIABILITIES | | | |
|---|---|---|---|---|---|---|---|
| Cash | Section 1 | $ | 20,000 | | | | |
| Stocks & Bonds | Section 2 | $ | - | Notes Payable | Section 8 | $ | 196,000 |
| Closely Held Business | Section 2a | $ | 5,000,000 | Taxes Owed | Section 3 | $ | - |
| Tax | Section 3 | $ | | Insurance Loan | Section 4 | $ | - |
| Insurance | Section 4 | $ | 12,500 | Accounts Payable | Section 9 | $ | - |
| Notes Receivable | Section 5 | $ | | Real Estate Payable | Section 6 | $ | 670,000 |
| Real Estate | Section 6 | $ | 1,175,000 | Other Liabilities | Section 10 | $ | - |
| Other Assets | Section 7 | $ | 607,000 | TOTAL LIABILITIES | | $ | 866,000 |
| | TOTAL ASSETS | $ | 6,814,500 | NET WORTH | | $ | 5,948,500 |

## INCOME AND EXPENSES

Alimony, child support or separate maintenance payment income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

| | | | | | | |
|---|---|---|---|---|---|---|
| Year | 2010 | Year | 2010 | Contingent Liabilities | | |
| Salary or Wages | $ 225,000 | Property Tax & Assessment | $ 8,000 | Endorser on Notes/Contracts | $ | - |
| Dividends or Interest | $ - | Fed & State Income Tax | $ 25,000 | Legal Claims & Judgements | $ | - |
| Rentals (Gross Income) | $ - | Real Estate Loan Payments | $ 48,000 | Provision For Taxes | $ | - |
| Business (Net Income) | $ 500,000 | Payments on Contract/Notes | $ 18,000 | Other Special Debt (Describe) | $ | - |
| Other Income (Describe) | | Estimated Living Expenses | $ 100,000 | | | |
| | | Other | | | | |
| TOTAL INCOME | $ 725,000 | TOTAL EXPENSES | $ 199,000 | TOTAL | $ | - |

| Section 1 | CASH | | | |
|---|---|---|---|---|
| Account Type | Bank | Balance | Pledged for a loan? | |
| Checking | Wells Fargo | $ 20,000 | No | |
| | | | | |
| | | | | |
| | Total | $ 20,000 | | |

| Section 2 | STOCKS AND BONDS | | | | |
|---|---|---|---|---|---|
| Description | No. Shares | Registered in Name of | Price per share | Purchased on Margin/Pledged | Total Value |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |

## Section 2a     INTERESTS IN CLOSELY HELD BUSINESS

| Description | Value of Business | Registered in Name of | Source and Date of Valuation | Total Value |
|---|---|---|---|---|
| PCS | 5,000,000 | James Holman | $ 1.00 | $ 5,000,000 |
| | | | $ 1.00 | $ - |
| | | | | $ 5,000,000 |

## Section 3     TAXES

| | Amount of Tax Refund Due | Amount of Tax Owed |
|---|---|---|
| | $ | |

## Section 4     LIFE INSURANCE

| Insured | Primary Beneficiary | Face Amount | Actual Cash Value | Loans on Policy | Name of Company | Location of Office |
|---|---|---|---|---|---|---|
| James Holman | Holman Family Trust | $ 10,000,000 | $ - | $ - | West Coast Life | PDX, OR |
| James Holman | Holman Family Trust | $ 50,000 | $ 12,500 | $ - | NW Mutual | PDX, OR |
| | | | | $ - | | |
| Total | | $ 10,050,000 | $ 12,500 | $ - | | |

## Section 5     ACCOUNTS AND NOTES RECEIVABLE

| Owners | Due From | Address | Collateral | Maturity Date | How Payable $ per month | Balance Due |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | $ - | $ - |

## Section 6     REAL ESTATE OWNED

| | Property A | Property B | Property C | Property D |
|---|---|---|---|---|
| Type of Property | Primary Residence | Beach House | | |
| Address | Mulino, OR | Glenedan Beach, OR | | |
| Owner | James & Candice Holman | James & Candice Holman | | |
| Date Purchased | 8/1/2003 | 6/1/2004 | | |
| Original Cost | $ 400,000 | $ 240,000 | | |
| Present Market Value | $ 775,000 | $ 400,000 | | |
| Mortgage Holder | Countrywide | Citibank | | |
| Annual Taxes | $ 5,000 | $ 2,500 | | |
| Monthly Income | $ - | $ - | | |
| Monthly Payments | $ 1,980.00 | $ 1,100.00 | | |
| Mortgage Balance | $ 450,000 | $ 220,000 | | |

670k Total Refinanced

## Section 7     OTHER ASSETS AND PERSONAL PROPERTY

| Automobiles Year/Make | Value | RV / Boats Year/Make | Value | Personal Prop | Value | Totals | |
|---|---|---|---|---|---|---|---|
| 2008 Chevy | $ 45,000 | 2005 SeaSport | $ 110,000 | Furniture | $ 35,000 | Autos | $ 110,000 |
| 2010 Range | $ 65,000 | 2007 Sleds (4) | $ 45,000 | Jewelry | $ 90,000 | R/V's | $ 158,000 |
| | | 2005 ATV | $ 3,000 | Equipment | $ 170,000 | Per. Prop | $ 339,000 |
| | | | | Others | $ 44,000 | | |
| Subtotal Autos | $ 110,000 | Subtotal R/V's | $ 158,000 | Subtotal per prop | $ 339,000 | Total oth. assets | $ 607,000 |

## NOTES AND LOANS PAYABLE (EXCLUDED REAL ESTATE)

| Section 8 Payable To | Address | Collateral | Person (s) Liable | Maturity Date | How Payable $ per month | Balance Due |
|---|---|---|---|---|---|---|
| CEFCU | Milwaukie, OR | Suburban | James & Candice Holman | 3/3/13 | $ 840 | $ 39,000 |
| CEFCU | Milwaukie, OR | Rover | James & Candice Holman | 6/15/15 | $ 1,000 | $ 65,000 |
| National City Bank | Cleveland, OH | Boat | James & Candice Holman | 9/1/24 | $ 667 | $ 92,000 |
| | | | | Totals | | $ 196,000 |

## ACCOUNTS AND BILLS PAYABLE (Including Bank Cards)

| Section 9 | Payable to | Account Number | Person (s) Liable | How Payable $ per month | Balance Due |
|---|---|---|---|---|---|
| Bankcharge Cards | Paid off monthly | | | | $ |
| Bankcharge Cards | | | | | $ |
| Open & Revolving Accts | | | | | $ |
| Open & Revolving Accts | | | | | $ |
| Other | | | | | $ |
| | | | | Total | $ |

## OTHER LIABILITIES

| Section 10 Payable To | Person (s) Liable | Collateral | How Payable per Month | Balance Due |
|---|---|---|---|---|
| | | | | $ |
| | | | | $ |
| | | | | $ |
| | | | | $ |

## APPLICANT INFORMATION

| Social Security Number | Employer | Salary | Occupation | No of Years |
|---|---|---|---|---|
| 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 | PCS | $ 225,000 | CEO | 10 |

Alimony, child support or separate maintenance payment income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation

Alimony - Do you have alimony payments?( yes/no) ___ No

Have you established a trust? (yes/no) ___ Yes

Have you made a will? (yes/no) ___ Yes       Have you guaranteed or endorsed the notes of any other person ? (yes/ no) ___ No

Have any actions or suits been filed against you or are there any unsatisfied judgements or decrees entered against you, or have you ever been adjudged bankrupt or made any assigments for creditors? (yes/no) ___ No       If answered "Yes", please explain:

Explanation:

## CO-APPLICANT INFORMATION

| Social Security Number | Employer | Salary | Occupation | No of Years |
|---|---|---|---|---|
| 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 | Homemaker | $ | Homemaker | |

Alimony, child support or separate maintenance payment income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation

Alimony - Do you have alimony payments?( yes/no) ___ No

Have you established a trust? (yes/no) ___ Yes

Have you made a will? (yes/no) ___ Yes       Have you guaranteed or endorsed the notes of any other person ? (yes/ no) ___ No

Have any actions or suits been filed against you or are there any unsatisfied judgements or decrees entered against you, or have you ever been adjudged bankrupt or made any assigments for creditors? (yes/no) ___ No       If answered "Yes", please explain:

Explanation:

## SIGNATURES

I authorize lender to make inquiries as necessary to verify the accuracy of the statements made and to determine my creditworthness. I certify the above and the statements contained in the attachments are true and accurate as of the stated date (s). I understand that Columbia CommunityBank is relying on this statement of my financial condition in making loan (s) to me. Columbia Community Bank may disclose to any other interested party Lender's experience with this account. I agree to inform the Lender immediately of any matter which will cause any significant change in my financial condition. I understand that Lender will retain this financial statement whether or not credit is granted.

_____   _____      _____   _____
Applicant's Signature              Date            Co-Applicant's Signature          Date

Oct. 21. 2014 12:15 AM   9496401575   949) 640-1575   PAGE. 15/ 17

Case 14-03285-rld   Doc 26   Filed 07/17/15

**CERTIFICATE OF SERVICE**

I hereby certify that I served the attached **DECLARATION OF DARIAN STANFORD IN SUPPORT OF PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** on the following person(s) on the date indicated below:

Paul B. Heatherman
Law Offices of Paul Heatherman PC
250 NW Franklin Ave, #402
Bend, OR 97701
*Of Attorneys for Debtors-Defendants*

By the following indicated method(s):

☐ By **emailing** full, true, and correct copies thereof to say attorney to the email address noted above, which is the last known email address for said attorney, on the date set forth below.

☒ By notice of electronic filing using the E-filing system (UTCR 21.010).

☐ By causing full, true and correct copies thereof to be **mailed** to the attorney(s) at the attorney(s) last-known office address (as) listed above on the date set forth below.

DATED: July 17, 2015.

SLINDE NELSON STANFORD

By: 

Darian A. Stanford, OSB No. 994491
R. Hunter Bitner II, OSB No. 011146
*Of Attorneys for Dwight and Laura Daniels*

Page 3 – DECLARATION OF DARIAN STANFORD

SLINDE NELSON STANFORD
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250