1   Paul B. Heatherman - OSB #933000
    LAW OFFICE OF PAUL HEATHERMAN PC
2   PO Box 8
    Bend, OR 97709
3   Phone: 541-389-1010
    Fax: 541-382-6875
4   Email: paul@bendattorneys.com

5

6

7

8                    IN THE UNITED STATES BANKRUPTCY COURT

9                              DISTRICT OF OREGON

10  In re:                           )
                                     )        Case No. 14-35381-rld7
11  JAMES JOEL HOLMAN and            )
    CANDICE EVANGELINE HOLMAN,       )
12                                   )
                         Debtors.    )
13  _____)
                                     )
14  DWIGHT and LAURA DANIELS,        )        Adv. Proc. No. 14–03285-rld
    husband and wife                 )
15                                   )
                         Plaintiffs, )        **DEFENDANTS' REPLY TO**
16                                   )        **PLAINTIFFS' RESPONSE TO**
           vs.                       )        **DEFENDANTS' MOTION FOR**
17                                   )        **PARTIAL SUMMARY JUDGMENT**
    JAMES JOEL HOLMAN and            )
18  CANDICE EVANGELINE HOLMAN,       )
                                     )
19                       Defendants. )
                                     )
20  _____)

21                              **ARGUMENT**

22          Contrary to plaintiffs' argument on page 1 of their Response, there is no non-dischargeable

23  debt because there were no misrepresentations that give rise to a finding of fraud.  (See elements of

24  misrepresentation in Motion for Summary Judgment.)  Noteworthy in their Response, plaintiffs do

25  not dispute that they never communicated with defendant Candace Holman prior to making the loan:

26          "Q.  Safe to say no communications whatsoever with Mrs. Holman prior to February
                 of '011?
27

28  1 - Reply to Response to Motion for Summary Judgment

                                                              **Law Office of**
                                                           **Paul Heatherman PC**
                                                          250 NW Franklin Ave. #402
                                                                Bend, OR 97701
                                                            Phone: 541-389-1010
                                                              Fax: 541-382-6875
                                                      Email: paul@bendattorneys.com

                    Case 14-03285-rld    Doc 29    Filed 07/28/15

1    A. I believe that's safe to say."

2 Dep. Tr. of Dwight Daniels P. 9 l. 9-11. Absent representations, there can be no misrepresentations.

3    On page 3 of their Reply, plaintiffs argue that defendant Candace Holman signed the

4 promissory note and trust deed for the loan, and was the corporate secretary for purposes of assigning

5 potential life insurance proceeds (in the event Mr. Holman (but not Mrs. Holman), passed away).

6 These signatures are not misrepresentations. The act of signing a promissory note is not fraud.

7    Defendant Candace Holman signed only three documents: a corporate acknowledgment of

8 insurance, a promissory note, and a trust deed:

9    "Q. So we have three documents there with your handwriting on them. I'm
     wondering, of all this paperwork, everything we've got here, were you involved in
10    any way with any of it other than the promissory note that you signed because your
     husband asked you to, the deed of trust that you signed because your husband asked
11    you to and the corporate acknowledgment of the life insurance assignment that you
     acknowledged bacause your husband asked you to? Were you involved in any other
12    way with all of this?

13    A. No."

14  Dep. Tr. Candace Holman p. 41-42.

15    On page 3, lines 10-15, plaintiffs accuse defendants of "misrepresentations made on a

16 personal financial statement given to the Daniels by the Holmans * * *." In fact, plaintiffs have no

17 evidence that defendant Candace Holman ever made any representations on a financial statement,

18 or that defendant Candace Holman gave the personal financial statement to plaintiffs. Thus, the only

19 written documents associated with defendant Candace Holman, are her signatures on the documents

20 that were already issued after the loan decision was made. None of these documents wrongfully

21 induced them to make the loan.

22    Similarly, plaintiffs offer no evidence that defendant Candace Holman prepared or signed

23 any document that contains misrepresentations.

24    Plaintiffs cite *Eads v. Borman*, 234 Or App 324 (2010) for the proposition that defendant

25 James Holman was an agent of defendant Candace Holman. That is in error. In the *Borman* case,

26 the plaintiff attempted to imply an agency relationship based on a medical provider who referred and

27

28 2 - Reply to Response to Motion for Summary Judgment

**Law Office of**
**Paul Heatherman PC**
250 NW Franklin Ave. #402
Bend, OR 97701
Phone: 541-389-1010
Fax: 541-382-6875
Email: paul@bendattorneys.com

1   scheduled the patient with the alleged agent, also a medical provider. 227 P3d at 829. In that

2   instance, the court found "no right to control or an agreement to an agency relationship." Id.[1]

3         Plaintiffs' reliance on *Jennison v. Providence St. Vincent Med. Ctr*, 174 Or App 219 (2001)

4   is misplaced. That involved an apparent authority (not implied authority) analysis, and was unique

5   to the hospital context. 25 P3d at 367.

6         Plaintiff's implied agency argument contained in *Young v. Neill*, 190 Or 161 (1950) is

7   inapposite. There, at all material times, the spouse on which liability was imputed knew the

8   provisions of the subject lease, and consulted with her husband "freely in connection with their

9   business affairs." 220 P2d at 94. Additionally, another space in the subject building was issued to

10   a neighboring tenant, "with the knowledge and consent of Mrs. McGee." Id. Moreover, in the

11   *Young* case, the spouse on which liability was imputed assisted the plaintiffs in obtaining a loan, the

12   purpose of which was to launch the business over which the parties transacted. 190 Or at 174.

13         By extreme contrast, in this case, defendant Candace Holman knew virtually nothing about

14   the transaction, and was not involved in it:

15         "Q. Why did the company PCS -- why did the company need 300,000 in February
16          of 2011?

17         A. I don't recall at the time."

Dep. Tr. Candace Holman p. 12 l. 22-24.

18

19         "Q. If you were made an officer of one of the companies, would you know?

        A. No."

20

Dep. Tr. Candace Holman p. 15 l. 1-3.

21

22         "Q. Can you tell me, ma'am, why you signed those two documents?

23         A. No.

24         Q. Did your husband ask you to sign them?

25

26       [1]There is no apparent authority in this case, as the purported principal, defendant Candace
  Holman, never communicated or demonstrated to plaintiffs that defendant James Holman was her
27   agent. See *Borman*, 227 P3d at 831.

28   3 - Reply to Response to Motion for Summary Judgment

**Law Office of**
**Paul Heatherman PC**
250 NW Franklin Ave. #402
Bend, OR 97701
Phone: 541-389-1010
Fax: 541-382-6875
Email: paul@bendattorneys.com

1    A. Yes.

2    Q. When you signed those documents, were you aware of what they were or what they did?

3    A. No."

4    Dep. Tr. Candace Holman p. 15.

5    "Q. [B]efore the loan was agreed to, before it was issued, your husband sent what's
     called a personal financial statement. Okay?
6
7    A. Yes.

8    Q. Had you seen that?

9    A. No.

10   Q. To today you've never seen it?

11   A. No."

     Dep. Tr. Candace Holman p. 22 l. 9-16.
12
13   "Q. Who in your household takes care of the finances?

14   A. My husband.

15   Q. He pays the mortgage, he does all that kind of stuff?

16   A. Yeah.

17   Q. So you, as you sit here today, would not be aware whether those numbers were
     right or wrong, would you?
18
     A. No."

19   Dep. Tr. Candace Holman, P. 23-24.

20   Q. Do you remember any discussion about a UCC-1?

21   A. No.

22   Q. With the understanding that you had not seen Exhibit 8 and Exhibit 1, the
     personal financial stementthat your -- your husband did not show it to you, correct?
23
24   A. Right.

25   Q. Are you familiar with this form at all?

26   A. No."

     Dep. Tr. Candace Holman p. 25 l. 16-23.
27
28   4 - Reply to Response to Motion for Summary Judgment

                                            **Law Office of**
                                                   **Paul Heatherman PC**
                                                   250 NW Franklin Ave. #402
                                                            Bend, OR 97701
                                                       Phone: 541-389-1010
                                                         Fax: 541-382-6875
                                            Email: paul@bendattorneys.com

Case 14-03285-rld    Doc 29    Filed 07/28/15

1    "Q.  You two did not talk about the business?'

2    A.  No."

3   Dep. Tr. Candace Holman, P. 29 l. 24-25.

4        For the above reasons the court should grant defendants' motion for partial summary

5   judgment dismissing plaintiffs' claims against Candace Holman.

6        DATED this 23    day of July, 2015.

7                                    LAW OFFICE OF PAUL HEATHERMAN PC

8

9                                    /s/ Paul B. Heatherman
                                     Paul B. Heatherman - OSB #933000
10                                   Attorney for Debtors/Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   5 - Reply to Response to Motion for Summary Judgment

                                                              Law Office of
                                                          Paul Heatherman PC
                                                          250 NW Franklin Ave. #402
                                                                Bend, OR 97701
                                                          Phone: 541-389-1010
                                                              Fax: 541-382-6875
                                                    Email: paul@bendattorneys.com

**CERTIFICATE OF SERVICE**
Adversary Proceeding No. 14-03285-rld

I hereby certify that on July ___23___, 2015, I serve a true copy of the foregoing *Defendants'*
*Reply to Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment,* via first class
mail, on the following:

Darian A. Stanford
Slinde Nelson Stanford
111 SW 5th Ave., Ste 1940
Portland, OR 97204
*Attorney for Plaintiffs*

Dated: July ___23___, 2015.

/s/ Paul B. Heatherman
Paul B. Heatherman - OSB #933000
Attorney for Defendants/Debtors

6 - Reply to Response to Motion for Summary Judgment

**Law Office of**
**Paul Heatherman PC**
250 NW Franklin Ave. #402
Bend, OR 97701
Phone: 541-389-1010
Fax: 541-382-6875
Email: paul@bendattorneys.com

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON


In re:

JAMES JOEL HOLMAN, CANDICE

EVANGELINE HOLMAN,

        Debtors,

                  Case No. 14-35381-rld7

_____


DWIGHT DANIELS, LAURA DANIELS,

        Plaintiffs,

   vs.

JAMES JOEL HOLMAN,

CANDICE EVANGELINE HOLMAN,

        Defendants.

_____


DEPOSITION OF DWIGHT DANIELS

Volume 1, Pages 1 to 37

Taken on behalf of the Defendants

Tuesday, July 7, 2015

1          Q.    What about, to your knowledge, your spouse?
2   Did she speak with Candice Holman prior to the loan
3   issuance in February of '011?
4          A.    I don't know.
5          Q.    Okay.  And what about e-mails, any e-mail
6   communication, to your memory, with Mrs. Holman prior to
7   February of '011?
8          A.    No.
9          Q.    Okay.  Safe to say no communications
10  whatsoever with Mrs. Holman prior to February of '011?
11         A.    I believe that's safe to say.
12         Q.    Okay.  Certainly there have been
13  communications after February of '011?
14         A.    Of course.
15         Q.    With both Mr. and Mrs. Holman?
16         A.    Of course.
17         Q.    On a business as well as on a social scale?
18         A.    Yes.
19         Q.    Okay.  At least back then, say 2011, you
20  considered them friends?
21         A.    I consider them friends today.
22         Q.    Okay.  And I think the feeling is mutual.
23               I'm going to share with you a document that
24  I've marked as Exhibit 1.
25         A.    Okay.

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON


In re:

JAMES JOEL HOLMAN, CANDICE

EVANGELINE HOLMAN,

        Debtors,

                Case No. 14-35381-rld7

_____

DWIGHT DANIELS, LAURA DANIELS,

        Plaintiffs,

    vs.

JAMES JOEL HOLMAN,

CANDICE EVANGELINE HOLMAN,

        Defendants.

_____


DEPOSITION OF CANDICE EVANGELINE HOLMAN

Volume 1, Pages 1 to 44

Taken on behalf of the Plaintiffs

Tuesday, July 7, 2015

2

1        BE IT REMEMBERED THAT, the deposition of CANDICE

2    EVANGELINE HOLMAN was taken before Heather M. Ingram,

3    Certified Shorthand Reporter for the states of Oregon and

4    Washington, on Tuesday, July 7, 2015, commencing at the

5    hour of 2:46 p.m., the proceedings being reported in the

6    offices of Slinde, Nelson, Stanford, 111 S.W. Fifth Avenue,

7    #1920, Portland, Oregon.

8

9                        APPEARANCES:

10

11   SLINDE NELSON STANFORD
     By Mr. R. Hunter Bitner, II
12   hunter@slindenelson.com
     1940 US Bancorp Tower
13   111 S.W. Fifth Avenue
     Portland, Oregon 97204
14           Appearing for Mr. and Mrs. Daniels

15   LAW OFFICES OF PAUL HEATHERMAN, P.C.
     By Mr. Paul Heatherman
16   mail@bendattorneys.com
     250 N.W. Franklin Avenue, #402
17   Bend, Oregon 97701
             Appearing for Mr. and Mrs. Holman

18

19

20

21   ALSO PRESENT: Laura Daniels, Dwight Daniels

22            James Holman

23

24

25

1                    EXAMINATION INDEX

2

3    Examination                              Page

4    By Mr. Bitner                            4

5

6                      EXHIBIT INDEX

7                 (No exhibits marked.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    CANDICE EVANGELINE HOLMAN

2        was thereupon called as a witness on behalf of the

3    Plaintiffs and, after having been duly sworn, was examined

4                        and testified as follows:

5

6                            EXAMINATION

7    BY MR. BITNER:

8            Q.    Mrs. Holman, can you state your name for the

9    record, please?

10           A.    Candice, I-C-E --

11           Q.    Thank you.

12           A.    -- Evangeline Holman.

13           Q.    Okay.  Ma'am, have you ever been deposed

14   before?

15           A.    Just once.

16           Q.    Okay.  What did that case involve?

17           A.    Just PACCAR, I believe.

18           Q.    Okay.  Was that a loan or was there some

19   financing involved or how did that work?

20           A.    Yeah.

21           Q.    Why were you deposed in that case?

22           A.    Actually, I think that was -- I don't know.  I

23   don't know.

24           Q.    Do you remember going --

25           A.    Actually, we didn't do this, no.

1        Q.    You don't remember doing this?

2        A.    No, we didn't do this.  Sorry.

3        Q.    I'm not talking about involvement in

4    litigation.  I'm talking literally a deposition where you

5    sit down and answer questions.

6        A.    No.  Sorry.

7        Q.    Well, you've had the great luxury, and I know

8    fun, of sitting through three of these now, so I'm going to

9    belabor you with the same stuff I told your husband.

10            I want to make sure we're on the same page

11   because you're new at this and I get it.  It's not easy to

12   remember some of this.  I want you to make sure you

13   understand what I'm asking you.

14       A.    Okay.

15       Q.    I can usually fix it.  If you do answer, I'm

16   going to assume you understood it.

17       A.    Uh-huh.

18       Q.    Is that a yes?

19       A.    Yes.

20       Q.    There's the next one.  Do your best with yes

21   or no.  You'll fail sometimes, and that's fine.  You'll see

22   me either do this, (indicating), or, Is that a yes or no?

23       A.    Okay.

24       Q.    Do your best -- and your husband did a great

25   job of this -- to make sure I'm done with the question

1    before you jump in.  If you're not done with the answer and

2    I jump in, tell me so we make sure we're not running over

3    each other because it makes her life miserable.  If you

4    need a break, let me know.

5            Did you have a chance to review anything to

6    prepare for today?

7        A.    No.

8        Q.    Okay.  Other than your husband, who I'm sure

9    you talk to every now and then, did you speak to anyone to

10   prepare for today?

11       A.    No.

12       Q.    What's your date of birth, ma'am?

13       A.    1/27/71.

14       Q.    Okay.  I'm going to take a wild guess here and

15   say you're married to Mr. Holman?

16       A.    Yes.

17       Q.    How long have you been married?

18       A.    About 17 years.

19       Q.    He got that right.  Good.

20             He got -- well, he got the kids right, too?

21       A.    Yes.

22       Q.    All right.  I'm going to give you a catchall

23   here.  You sat here and listened to me grill Mr. Holman for

24   hours.  He had a lot of answers to a lot of questions.

25             Was there anything that he said that you

1  thought was untrue or wrong?

2        A.   No.

3        Q.   So you agreed with everything he testified to?

4        A.   Yes.

5        Q.   Okay.  Can you give me a thumbnail, ma'am, of

6  your education?

7        A.   Graduated from high school in '89, and I took

8  a few college courses.

9        Q.   Where did you graduate from high school?

10       A.   Oregon City.

11       Q.   Where did you take your few college courses?

12       A.   Clackamas.

13       Q.   You didn't get an associate's degree?

14       A.   No.

15       Q.   Do you have any certifications or

16  registrations or anything like that?

17       A.   No.

18       Q.   Some of the last things I asked your husband

19  were about you -- lucky you -- such as where you're working

20  currently.

21            Can you tell me where you're currently working

22  and what you do?

23       A.   I work at North Clackamas Christian School.

24       Q.   Uh-huh.

25       A.   And I do several different things.  I'm pretty

1    much on hand for whatever they need.

2              I did recess duty and detention duty.  I help

3    out with the auction and other fundraising things for the

4    school, and I enroll -- help enroll students, give tours of

5    our school.

6         Q.   So you're a Girl Friday.  It sounds like do

7    whatever they need?

8         A.   Yeah.

9         Q.   And your husband explained that part of your

10   compensation is an allowance on your kids' tuition.

11        A.   Yeah.

12        Q.   Is that correct?

13        A.   Right.

14        Q.   Do you know how much is disallowed from their

15   tuition?

16        A.   No.

17        Q.   Okay.

18        A.   I -- I just -- yeah, no.

19        Q.   And you're also paid some as well?

20        A.   Right.

21        Q.   How much do you make?

22        A.   Just minimum wage.

23        Q.   Okay.  Hourly?

24        A.   Yeah.

25        Q.   How long have you held that job?

1        A.   I just -- since September of this year.

2        Q.   Since September?

3        A.   Of 2014, I guess.

4        Q.   Okay.  Prior to September 2014, what's the

5 last job you'd held?

6        A.   I was a director of a child care, and I --

7 that was in 2000.

8        Q.   2000?

9        A.   Yeah.

10       Q.   I'm sorry.  I was waiting for a --

11       A.   Yeah.  I -- in the summer after I had my son

12 Seth.

13       Q.   So from 2000 to 2014, you were taking care of

14 the kids?

15       A.   Yes.

16       Q.   Okay.  There's actually a better term for it

17 listed than I have, a homemaker or something like that?

18       A.   Yes, yes.

19       Q.   All right.  By no means am I denigrating that.

20            What made you go back to work?

21       A.   Some money for our family.

22       Q.   Okay.  I'm going to ask you a lot of the same

23 questions I asked your husband, not all of them, by any

24 stretch of the imagination.

25            First of all, have you ever been involved

1    in -- you actually answered part of this.  Have you ever

2    been involved in litigation, another lawsuit?

3          A.   Just the PACCAR.

4          Q.   Okay.  Were you a main defendant in that case

5    or just a witness?

6          A.   I -- I don't know.

7          Q.   Were you named?

8          A.   Yes.

9          Q.   Like on this one?

10         A.   Uh-huh.

11         Q.   Okay.  How did that case come out?

12         A.   I -- sorry.  I don't know.

13         Q.   You don't know?

14         A.   I don't remember.

15         Q.   You don't remember it going to trial, do you?

16         A.   No.  It didn't.

17         Q.   Have you ever been involved in administrative

18   actions?  By that, I mean have you ever filed for

19   unemployment?

20         A.   No.

21         Q.   How about Workers' Compensation?

22         A.   No.

23         Q.   Okay.  Prior to the bankruptcy we've been

24   talking about today, the two bankruptcies, have you ever

25   been involved in a bankruptcy?

1          A.    No.

2          Q.    I asked your husband, so I might as well ask

3     you, too.

4                Do you know, as you sit here today, what the

5     current status is of the bankruptcies?

6          A.    I don't.

7          Q.    Are you aware one way or the other what the

8     status is of the house?  Have you been told you're going to

9     have to move at some point?

10         A.    No.

11         Q.    No, you haven't or no, you don't know?

12         A.    No, I -- no, we haven't been told.

13         Q.    Okay.  As you have heard repeatedly today,

14    we're here today about a loan that was made from the

15    Daniels to you and Mr. Holman.

16               I'm wondering when the first was that you

17    actually met the Daniels.  And by meet, I mean phone,

18    e-mail, anything like that.

19         A.    I only remember meeting them at their home.

20         Q.    When was that?

21         A.    I believe it was in the summertime of late --

22    in 2011.

23         Q.    Okay.  Was it a social visit or what was going

24    on?

25         A.    Yeah, just to meet them.

1          Q.   Okay.  Did you meet them at any other time?

2          A.   No.

3          Q.   Just the one time?

4          A.   Uh-huh, yeah.

5          Q.   Okay.

6          A.   Not before then.

7          Q.   Not before then.  How about after that?

8          A.   After that, yeah.

9          Q.   You spent time with them after that from time

10   to time?

11         A.   A couple times, yeah.

12         Q.   Let's talk about this loan we're here about

13   today.

14              What's your understanding, as you sit here,

15   ma'am, for the purpose of that loan?

16         A.   For business.

17         Q.   I asked your husband this.  Let's assume -- I

18   think we verified that the loan was February of 2011.

19   Okay?

20         A.   Yes.

21         Q.   See, you're getting it.

22              Why did the company PCS -- why did the company

23   need 300,000 in February of 2011?

24         A.   I don't recall at the time.

25         Q.   You heard conversation between -- well,

1    actually, let me follow up on that.

2               Was it your understanding that the company was

3    having financial problems in 2011?

4         A.   No.

5         Q.   Okay.  Did you know one way or the other or

6    was it your understanding the company was fine?

7         A.   Yeah, it was fine.

8         Q.   Okay.  Your husband and I talked a little bit

9    about officers in various companies.

10            Were you ever an officer in any of the

11   companies that you and your husband had?

12        A.   Not that I remember, no.

13        Q.   There was a piece of paper that lists -- I

14   think it said "SEC" next to your name.

15          Do you remember being the secretary of any

16   company?

17        A.   I don't.

18        Q.   Let me show you that.  It's Exhibit 7.  It's

19   an assignment of a life insurance policy.  I want you to

20   take a look at it.

21          First of all, do you see your signature on the

22   first page down at the bottom?

23        A.   Yes.

24         Q.   Which one?

25        A.   The one on the right.

1          Q.   Does it say "SEC" next to your name?

2          A.   Yes.

3          Q.   Do you know what that means?

4          A.   No.

5          Q.   Can you turn the page for me?  There's a

6    corporate acknowledgment there.

7               Do you see that?

8          A.   Yes.

9          Q.   And there's a -- if I get this wrong, I

10   apologize.  It's Candice Evangeline?

11         A.   Yes.

12         Q.   Is that you?

13         A.   Yes.

14         Q.   Is there a reason why you didn't use your last

15   name on that one?

16         A.   Yeah.

17         Q.   I'm sorry.  Yes?

18         A.   I don't know why.

19         Q.   Okay.  Does this refresh your recollection at

20   all that you were actually involved with the corporation or

21   one of the corporations?

22         A.   No.

23         Q.   You don't remember being made an officer of

24   any of the companies?

25         A.   No.

15

1          Q.   If you were made an officer of one of the

2   companies, would you know?

3          A.   No.

4          Q.   While we're looking at documents, I'm going to

5   show you these as well.  I'll show you what's called

6   Exhibit 2.  It's a promissory note.

7               Can you tell me whether or not your signature

8   is on that one?

9          A.   Yes.

10         Q.   Go ahead and hold that for a second.  Here's

11  3, same question, is that your signature?

12         A.   Yes.

13         Q.   Okay.  Can you tell me, ma'am, why you signed

14  those two documents?

15         A.   No.

16         Q.   Did your husband ask you to sign them?

17         A.   Yes.

18         Q.   When you signed those documents, were you

19  aware of what they were or what they did?

20         A.   No.

21         Q.   Did you ask your husband to explain them to

22  you?

23         A.   No.

24         Q.   You just signed them where he told you to sign

25  them?

1        A.    Yes.

2        Q.    Okay.  By no means am I denigrating you in any

3   way by asking you this question, but was that common in the

4   business?  Did you just sign what your husband asked you to

5   sign?

6        A.    Yes.

7        Q.    You said a moment ago -- I'm jumping around a

8   little bit on you -- that it was your understanding that

9   the loan was for the business, right?

10       A.    Yes.

11       Q.    How did you come to that understanding?

12       A.    Because that's what James had shared with me

13  that they had talked about.

14       Q.    Got it.

15             Prior to talking with the Daniels, were you

16  aware that Mr. Holman was looking for a loan?

17       A.    I don't remember that.

18       Q.    You don't remember any conversations about

19  that?

20       A.    No.

21       Q.    At some point, it sounds like you two had a

22  conversation that Mr. Holman had been put in touch with the

23  Daniels.  Correct?

24       A.    Yes.

25       Q.    Tell me about that.  What did he tell you?

1          A.   Just that he had met them through Forrest.

2          Q.   Uh-huh.

3          A.   And that they were going to be loaning us

4    money for the company.

5          Q.   Okay.  And you knew Mr. Reinhardt?

6          A.   I -- I knew of him.

7          Q.   Okay.  Had you ever met him?

8          A.   I don't know if it was at that time, but I've

9    met him.

10          Q.   Since?

11          A.   Yeah.

12          Q.   Okay.  Did you have any conversations with

13    Mr. Reinhardt about the Daniels?

14          A.   No.

15          Q.   And you said your husband told you that he had

16    been put in touch with the Daniels about getting a loan for

17    the company, right?

18          A.   Yes.

19          Q.   Did he tell you how much?

20          A.   Not that I remember.

21          Q.   Did you and your husband ever talk about the

22    terms of the loan?

23          A.   No.

24          Q.   The house you live in currently is in Mulino;

25    is that right?

18

1       A.   Yes.

2       Q.   Mill Creek?

3       A.   Yes.

4       Q.   Are you on the title for that home?

5       A.   I don't know.

6       Q.   Did you ever, to your knowledge, have any

7  ownership interest in any of the companies we talked about

8  today, ITG, PCS, any of those?

9           MR. HEATHERMAN:  Do you understand his

10  question?

11           THE WITNESS:  No.

12           MR. HEATHERMAN:  Can you define "ownership

13  interest" or rephrase it?

14           MR. BITNER:  Sure.

15

16  BY MR. BITNER: (Continuing)

17       Q.   Let's take PCS for a moment.  Was PCS 100

18  percent owned by Mr. Holman?  Did he own the entire company

19  or did he have partners?

20       A.   Well, I think I was his partner.

21       Q.   That's kind of the question I was asking.

22       A.   Okay.

23       Q.   I'm wondering if there was any kind of

24  agreement out there, any piece of paper or anything like

25  that, that said this company is owned 50 percent by A or B

1  or anything like that.  I'm wondering if you had any formal

2  ownership interest in any of the companies.  That's what I

3  mean by ownership interest.

4            Does that make sense?

5      A.   Yes, possibly.

6      Q.   Okay.

7      A.   I can't say what.

8      Q.   Were you ever paid any money by any of the

9  companies?

10      A.   No.

11      Q.   Okay.  I had asked your husband earlier during

12  this whole loan process if he had counsel to represent

13  anyone.  He identified Mr. Mitchell.

14            Do you know Mr. Mitchell?

15      A.   Yes.

16      Q.   Did you ever have any conversations with him?

17      A.   No.

18      Q.   And I apologize I just asked you this, but my

19  brain is slipping outside my head right now.

20            Did you and your husband talk about the terms

21  of the loan?

22      A.   Not that I remember.

23      Q.   Okay.  For example, do you remember your

24  husband ever telling you, Hey, we're putting up the house

25  against this loan?

20

1              MR. HEATHERMAN:  This would have been prior to

2    February or any time?

3              MR. BITNER:  I'm being broad here, to be

4    honest with you.

5              MR. HEATHERMAN:  He's asking at any time.

6              MR. BITNER:  Thank you.  I'll clarify it a

7    little bit.

8

9    BY MR. BITNER: (Continuing)

10        Q.    There were -- you heard me and your husband

11   talk about this.  There were conversations and machinations

12   that went on prior to the loan being issued, We're going to

13   do this for security, this for security.

14             Did you have any conversations with Mr. Holman

15   or the Daniels or anyone regarding what was going to be

16   used as security for this loan prior to issuance?

17        A.    Just James.

18        Q.    Okay.  What did you two talk about?  What did

19   you find out?

20        A.    Honestly, I don't remember exactly what we

21   discussed.

22        Q.    You remember --

23        A.    I just --

24        Q.    Sorry.  Go ahead.

25        A.    It's okay.  Go ahead.

1          Q.    I told you I'd interrupt you eventually.

2                Do you remember him telling you that the house

3     was being put up against the loan?

4          A.    Vaguely.

5          Q.    Okay.  Do you remember him telling you about

6     any of the company's assets being put up against the loan?

7          A.    No.

8          Q.    There's a bunch of documents -- well, begging

9     the obvious, you had seen the promissory note and the trust

10    deed because you signed them, correct?

11         A.    Yes.

12         Q.    Okay.  Did you actually ever read those?

13         A.    No.

14         Q.    To date?  To today?

15         A.    No.

16         Q.    Okay.  Your husband and I talked about a UCC

17    filing statement that's Exhibit 4.  Had you ever seen that?

18         A.    No.

19         Q.    To today?

20         A.    No.

21         Q.    Okay.  Ever have any conversations with your

22    husband about a UCC financing statement?

23         A.    No.

24         Q.    Or Mr. Mitchell?

25         A.    No.

 1          Q.   Ever have any conversations with your husband

 2     or anyone, other than your counsel -- I don't want to know

 3     anything there -- about a change in the security for the

 4     loan?

 5          A.   No.

 6          Q.   I'm telling you things you already know

 7     because I know you've been sitting here probably asleep

 8     with the rest of us.

 9               Before the loan was agreed to, before it was

10     issued, your husband sent what's called a personal

11     financial statement.  Okay?

12          A.   Yes.

13          Q.   Had you seen that?

14          A.   No.

15          Q.   To today you've never seen it?

16          A.   No.

17          Q.   Okay.  I'm going to show that to you.  I want

18     you to just take a minute and look through the pages.  You

19     don't have to memorize it.

20          A.   (Pause-referring).  Okay.

21          Q.   Same question I asked you before, have you

22     ever seen this before?

23          A.   No.

24          Q.   Did you notice on page 3 that your information

25     is on there?  I'll direct you to almost the bottom of the

23

1   page where it says "co-applicant."

2        A.   Yes.

3        Q.   I assume that's your Social Security number?

4        A.   Yes.

5        Q.   Does it say "homemaker"?

6        A.   Yes.

7        Q.   Did Mr. Holman tell you he was sending this

8   information to the Daniels?

9        A.   I don't remember.

10       Q.   Do you remember ever having a discussion about

11  this, the document itself?

12       A.   I don't remember.

13       Q.   Okay.  You don't remember ever seeing it,

14  correct?

15       A.   No.

16       Q.   You already testified to that?

17       A.   Right.

18       Q.   The information -- first of all, I want you to

19  just take a look at it.  I'll look along with you.

20            Are you -- well, let me ask you this, first of

21  all:  Who in your household takes care of the finances?

22       A.   My husband.

23       Q.   He pays the mortgage, he does all that kind of

24  stuff?

25       A.   Yeah.

24

1        Q.   So you, as you sit here today, would not be

2   aware whether these numbers were right or wrong, would you?

3        A.   No.

4        Q.   Okay.  If I asked you this, I apologize:  Did

5   you ever ask your husband why he was having you sign these

6   documents?  By these documents, I mean Exhibits 2 and 3.

7        A.   No.

8        Q.   You just signed it because he told you to?

9        A.   He asked me to.

10       Q.   Because he asked  -- I'm sorry.  Because he

11  asked you to.  I'm sorry.  I didn't mean that.

12            MR. HEATHERMAN:  Let me give her a quick

13  break, and you can take your time when we get back.

14            MR. BITNER:  Sure.  No problem.

15            MR. HEATHERMAN:  Again, Mrs. Holman, if you

16  want a break at any time, just tell me.

17            MR. HEATHERMAN:  Thank you.

18            (Pause in proceedings: 3:09-3:12 p.m.)

19        ?

20

21  BY MR. BITNER: (Continuing)

22       Q.   Mrs. Holman, we're back on the record.  Do you

23  need to clarify anything or change anything?

24       A.   No.

25       Q.   Okay.  I wanted to backtrack a little bit to

25

1    something I asked you a moment ago, and that was whether or

2    not you had any familiarity with UCC-1s or know anything

3    about them.  You said no.

4            There was testimony earlier from your husband

5    that the four of you -- by the four of you, I mean you two

6    and the two Daniels -- had a conversation around May 2013

7    about all of this.

8            Do you remember that conversation?

9        A.   I remember speaking with them, but honestly, I

10   can't tell you what was said.

11       Q.   Okay.  Do you remember, were you engaged in

12   that conversation or were you just listening?

13       A.   Just listening, I believe.  I -- I don't know

14   that I said anything.

15       Q.   Okay.  I know you said you don't remember

16   everything that was talked about.  Do you remember any

17   discussions about a UCC-1?

18       A.   No.

19       Q.   With the understanding that you had not seen

20   Exhibit 8 and partial Exhibit 1, the personal financial

21   statement that your -- your husband did not show it to you,

22   correct?

23       A.   Right.

24       Q.   Are you familiar with the form at all?

25       A.   No.

1          Q.   Do you ever remember filling out an

2     application for a loan or any kind of lending?

3          A.   No.

4          Q.   Do you remember ever signing documents --

5     other than the ones we're talking about here today, signing

6     any other loan agreements or documents for lending?

7          A.   No.

8          Q.   By that, I mean promissory notes and that kind

9     of thing, same kind of document.

10         A.   No, I don't.

11         Q.   Same answer?

12         A.   Correct.

13         Q.   Do you agree with me -- and I can show it to

14    you again.  Do you agree with me, ma'am, that you're listed

15    as a co-applicant on this statement?

16         A.   Yes.

17         Q.   Do you have any idea what that means?

18         A.   100 percent, no.

19         Q.   Okay.  What do you think it means even if it's

20    30 percent?

21         A.   That we -- that I am applying with him.

22         Q.   Okay.  You heard us talk about a lot of

23    e-mails today back and forth between Mr. Daniels and

24    Mr. Holman.

25              Did Mr. Holman ever run any of those e-mails

1   by you, either before or after they were sent?

2          A.   Not that I remember.

3          Q.   Okay.  For example, there was a letter in

4   there that was sent from Mr. and Mrs. Daniels to you and

5   Mr. Holman.  I believe it was in June of 2013.

6               Do you remember reading that?

7          A.   No.

8          Q.   Okay.  Do you think you read it?

9          A.   I don't think I read it.

10         Q.   Okay.

11         A.   I think James just shared it with me.

12         Q.   The crux of it?

13         A.   Yeah.

14         Q.   And Mr. Holman then sent a response e-mail

15  literally about two days later signing it James and

16  Candice?

17         A.   (Nodding head).

18         Q.   Do you remember that?

19         A.   Yes.

20         Q.   Okay.  Do you remember reviewing that e-mail?

21         A.   No.

22         Q.   Okay.  Either before or after it was sent?

23         A.   Right, no.

24         Q.   Okay.  Forget the personal financial

25  statement.  Do you remember Mr. Holman ever asking you,

1   Hey, how much do you think the house is worth?  How much do

2   you think we owe on it or anything like that?

3       A.   No.

4       Q.   As you sit here today, ma'am, do you know how

5   much equity you have in that house?

6       A.   No.

7       Q.   I'm begging the obvious, the answer would be

8   the same for February of 2011?

9       A.   Correct.

10      Q.   Do you know, again, as you sit here now, in

11   2011 how many mortgages you had on the house?

12      A.   No.

13      Q.   Or how much you were paying?

14      A.   No.

15      Q.   That was all Mr. Holman?

16      A.   Yes.

17      Q.   Okay.  Is it accurate for me to say that

18   businesswise, you had no role whatsoever?

19      A.   Correct.

20      Q.   Okay.  Personalwise in your household, you had

21   no role in finances whatsoever?

22      A.   No.

23      Q.   That was my fault.

24           Is that true?

25      A.   Say that again.

1          Q.   Sure.  It was confusing.  We'll start from the

2    start.

3               Is it true that in your personal life,

4    household expenses, you had no role?

5          A.   No, not really.

6          Q.   Okay.  See, that's where -- that's a true

7    statement that you had no role?

8          A.   Correct.

9          Q.   Thank you.  Sorry.  It was a poorly worded

10   question.  It just gets confusing.

11              You relied upon your husband?

12         A.   Yes.

13         Q.   Okay.  Your husband listed your net worth at

14   about $5,900,000 and total assets of about 6.8.

15              He was responsible for all that money, right?

16         A.   Yes.

17         Q.   In one of the letters or e-mails -- I forget

18   which -- he identified approximately $8 million in

19   liabilities.  This is when you were about to declare

20   bankruptcy.  He said you had about $8 million plus in

21   liabilities.

22              Were you aware of that?

23         A.   No.

24         Q.   You two didn't talk about the business?

25         A.   Not really.

1        Q.   How about the bankruptcy, did Mr. Holman talk

2  to you about the bankruptcy before you filed it?

3        A.   With PCS?

4        Q.   Yes, we'll start there, yes.

5        A.   That -- that it's just probably going to be

6  happening.

7        Q.   Okay.  That wasn't your decision to declare

8  it, though, right?

9        A.   No.

10       Q.   What about personal bankruptcy, how did that

11  play out?

12       A.   What do you mean?

13       Q.   The personal bankruptcy is the bankruptcy of

14  both you and Mr. Holman, correct?

15       A.   Yes.

16       Q.   Did you have any role in the declaration of

17  that bankruptcy?  Did you two sit down and talk about it?

18       A.   Yes.

19       Q.   Okay.  What did you talk about?

20       A.   Just that we -- that we needed to do that.

21       Q.   It was a hard decision?

22       A.   Yes.

23       Q.   Did you agree with him that it needed to be

24  done?

25       A.   Yes.

1       Q.   Okay.   Why?

2       A.   Because we had no other way to go about

3 anything.

4       Q.   To pay off your obligations, is that what

5 you're saying?

6       A.   Right.

7       Q.   Did you and Mr. Holman, leading up to that,

8 talk about, Hey, what can we do? Is there any other way we

9 can go about doing this?

10       A.   Well, sure, yes.

11       Q.   And --

12       A.   But we couldn't do anything. We didn't have a

13 choice.

14       Q.   Okay. When it came to what to list as an

15 asset or what to list as a liability or a debt, who was

16 involved in that?

17       MR. HEATHERMAN: In the schedules?

18       MR. BITNER: Correct. Yeah, in the bankruptcy

19 paperwork.

20       THE WITNESS: I guess we both were.

21

22 BY MR. BITNER: (Continuing)

23       Q.   Did you sit down and go, Hey, let's make a

24 list?

25       A.   About some, yeah.

1        Q.    Okay.  And that's in the personal bankruptcy,

2  right?

3        A.    Right.

4        Q.    You had no role whatsoever on the business

5  bankruptcy?

6        A.    No, none.

7        Q.    I'm sorry.  That was none?

8        A.    None.

9        Q.    Thank you.

10        I asked your husband about this, and I'll ask

11  you:  Leading up to the bankruptcy, were either you or

12  Mr. Holman talking to anyone about getting more money,

13  selling the business, anything like that?  Were there

14  discussions with outsiders about things like that --

15        A.    No, not --

16        Q.    -- that you're aware of?

17        A.    Right.

18        Q.    Okay.  Do either you -- and you heard me ask

19  Mr. Holman at the end of this, and this is a question borne

20  out of my ignorance.  Okay?  I just don't know the answer

21  is why I'm asking.

22        You have expenses now, obviously.  You still

23  have to -- you have to eat.  You've got to -- you've got to

24  live.

25        A.    Yes.

1           Q.    I understand you're making some money, and

2    you're definitely helping with the school.

3           A.    Right.

4           Q.    How are you making ends meet otherwise?  Let

5    me ask this.  Let me back away from that for a moment.

6                 Are there any funds out there unaffected by

7    the bankruptcy, trust accounts, any accounts, anything that

8    you're able to utilize?

9           A.    No.

10          Q.    Okay.  I know you're not paying the mortgage.

11   Mr. Holman explained that to me.

12          A.    Right.

13          Q.    I understand the education, Oregon Health

14   Plan, the food stamps.

15                Are there other ways you're making ends meet,

16   other money coming in from any other source?

17          A.    Some family.

18          Q.    Family.  Okay.

19                Personal loans basically from the family or

20   gifts?

21          A.    Gifts.

22          Q.    Okay.  I should have asked your husband this,

23   but I forgot.  Has your husband been able to make any money

24   since he was unemployed in 2013?  Has he taught any classes

25   in guns or anything like that?

1      A.   No.

2      Q.   You heard me ask your husband about some of

3   the pleadings in this case.  By pleadings, that's these

4   documents, the formal official looking things.

5           Did you play any role in coming up with the

6   answers for this kind of stuff?

7      A.   No.

8      Q.   Okay.  For example, this is the answer and

9   affirmative defenses to our complaint.  You heard me ask

10  your husband stuff like, Hey, there's an allegation here

11  that Mr. and Mrs. Daniels were savvy investors and owned a

12  bank, that kind of stuff.

13          Did any of that information come from you?

14     A.   No.

15     Q.   You had no role in that whatsoever?

16     A.   No.

17     Q.   Correct?

18     A.   Correct.

19     Q.   The interrogatories and requests for

20  admissions, they were sent to you and your husband.

21          Same question:  Did you have any role in

22  preparing the responses to these?

23     A.   No.

24     Q.   Have you ever seen them before?

25     A.   I don't remember.

35

1          Q.    For example, one of the interrogatories --

2                MR. BITNER:  If you want to look, Counsel,

3     it's Exhibit 17.

4          Q.    -- asks what your net worth was in 2011.

5                Did anyone ask you, Hey, Candice, what was

6     your net worth in 2011?

7          A.    I don't remember.

8          Q.    Does any of that look familiar to you at all?

9          A.    No.

10         Q.    Okay.  I'm turning my attention now to Exhibit

11    18.  These are your responses to what I call -- excuse me,

12    what are called requests for admissions.  All they are is

13    hey, Mr. and Mrs. Holman, either admit or deny this

14    statement.

15               So I'll ask you first, does this look familiar

16    to you at all?

17         A.    It doesn't look familiar to me, no.

18         Q.    Okay.  Do you remember ever sitting down with

19    your husband, or anyone for that matter, and answering

20    something like this?

21         A.    I -- I think probably James sat with me and

22    asked me questions, but I don't remember.

23         Q.    You don't have any memory of that?

24         A.    No.

25         Q.    There's certain things on here where

1   Mr. Holman admits something and you deny it.  If you look

2   at request for admission number 1, the very first one, it's

3   admit that you represented -- "you" is actually a

4   collective you -- to plaintiffs that your personal

5   residence was worth $775,000.

6               Do you see that?

7         A.    That I requested?

8         Q.    Admit that you represented to plaintiffs --

9   "you," by the way, is a collective you -- that your

10  personal residence was worth 775,000 in February of 2011.

11              Do you see that?

12        A.    Yes.

13        Q.    Okay.  Mr. Holman admitted that.  You denied

14  it.

15              Why did you deny that?

16        A.    Because I wasn't a part of that.

17        Q.    Well, there's a difference between not being a

18  part and saying it didn't happen.

19              I'm wondering if you actually went back and

20  asked or looked to see if there was a representation that

21  the house was worth 775,000?

22        A.    No.

23        Q.    Okay.  Same thing with number 2, he admitted,

24  you denied.

25              Same answer, you just weren't involved in it?

1      A.   Yes.

2      Q.   Okay.  So it's not necessarily that you're

3  denying it, you just don't know.

4          Is that valid?

5      A.   No.  I -- I -- it wasn't from me.

6      Q.   You didn't make that representation, is that

7  what you're saying?

8      A.   I didn't come up with those numbers.

9      Q.   Okay.  Right.  In other words, you're denying

10  that you represented to plaintiffs that that number was

11  correct; am I right?

12      A.   Yes.

13      Q.   Okay.  So is it your position, then, that the

14  personal financial statements were -- included

15  representations made only by Mr. Holman, not yourself?

16      A.   Yes.

17      Q.   Okay.  Request number 8 there, admit that at

18  the time you created your personal financial statement,

19  there were two mortgages.  Again, he admitted, you denied?

20          Which part of that are you denying, that there

21  were two mortgages or was there something else about that

22  request that made you deny?

23      A.   I'm not sure what you're asking.  I'm sorry.

24      Q.   Sure.  Again, my confusion is he's admitting

25  this, you're denying.  Okay?

1          A.    Yes.

2          Q.    I'm wondering why you denied that request.

3    What about that request made you say no, that's not true?

4          A.    Because it's not from me.  I wasn't...

5          Q.    You weren't what?

6          A.    Aware of that.

7          Q.    You didn't know?  Is that valid or is that

8    true?

9          A.    True.

10         Q.    Okay.  Number 10, down a couple there, admit

11   that you did not have the residence appraised to determine

12   its value in preparing your personal financial statement.

13               Same thing there, you just weren't involved?

14         A.    Right.

15         Q.    Okay.  Amazingly, I might be almost through

16   here.

17               MR. BITNER:  Can you give me a couple minutes?

18               MR. HEATHERMAN:  You mean privately?

19               MR. BITNER:  We'll walk out.

20               (Pause in proceedings: 3:30-3:34 p.m.)

21

22   BY MR. BITNER: (Continuing)

23         Q.    I forgot to ask you this.  I apologize.  Same

24   thing I asked your husband earlier.

25               Is there any reason today, ma'am, that you

1    would have a problem answering questions?  By that, I mean

2    medication or lifetime stresses or anything like that

3    that's affecting you, other than the stress of the

4    deposition?

5           A.   Lifetime stresses, really?  No.

6           Q.   Okay.  You told me earlier that you signed the

7    promissory note and deed of trust without reading them,

8    right?

9           A.   Yes.

10          Q.   Because your husband asked you to?

11          A.   Yes.

12          Q.   I think I said "told you."  That was my bad.

13               Are you aware, as you sit here now, what those

14   documents say or what affect they have?

15          A.   Somewhat.

16          Q.   What's your understanding?

17          A.   Well, which ones again?

18          Q.   I can show them to you if you want.  The

19   promissory note?

20          A.   Yes.

21          Q.   And the deed of trust, the two documents you

22   signed.  I'm wondering what's your understanding of -- what

23   do those documents do?

24          A.   They hold us accountable for an agreement.

25          Q.   For the loan?

1          A.    (Nodding head).

2          Q.    Is that accurate?

3          A.    Yes.

4          Q.    Okay.  As you sit here today, ma'am, do you

5     feel obligated that you owe Mr. and Mrs. Daniels $300,000?

6     Not legally.  I'm not talking about a legal opinion.  I'm

7     talking about your personal opinion.

8               MR. HEATHERMAN:  He's just asking about your

9     feeling, if you know it.

10              THE WITNESS:  Yes and no.

11

12    BY MR. BITNER: (Continuing)

13         Q.    You don't feel obligated?

14         A.    Yes, I do, but no, I don't.

15         Q.    This will shock you, but I might have to

16    follow up on that.  Yes, you do, but no, you don't.  Can

17    you explain that to me?

18         A.    Yes, because I understand about making an

19    agreement and following through with that.

20         Q.    Uh-huh.

21         A.    But at the same time no, because I don't know

22    how we can.

23         Q.    And I guess I see your point.  My question was

24    more theory than application.  I think you answered the

25    question.  We have a pile of paper here, obviously, and we

1  have two documents that you signed.  Well, I think you

2  signed two and acknowledged one.  We'll say that.

3         A.    Okay.

4         Q.    Let me ask you, I showed you what was a

5  corporate acknowledgment on the assignment of the life

6  insurance.

7               Do you remember that?  You signed it as --

8         A.    Yes.

9         Q.    -- Candice Evangeline, right?

10        A.    Yes.

11        Q.    What was the purpose of that acknowledgment?

12 Do you know?  Why did you have to do that?

13        A.    I don't know.

14        Q.    Did your husband ask you to do it?

15        A.    Yeah.

16        Q.    Okay.

17        A.    I guess.  I don't remember really.

18        Q.    So we have three documents there with your

19 handwriting on them.  I'm wondering, of all this paperwork,

20 everything we've got here, were you involved in any way

21 with any of it other than the promissory note that you

22 signed because your husband asked you to, the deed of trust

23 that you signed because your husband asked you to and the

24 corporate acknowledgment of the life insurance assignment

25 that you acknowledged because your husband asked you to?

42

1    Were you involved in any other way with all of this?

2          A.    No.

3          Q.    You did understand as of February 2011 that

4    the Daniels were lending not only Mr. Holman, but you as

5    well, $300,000, right?

6          A.    I don't know exactly when.

7          Q.    Okay.

8          A.    But, yes.

9          Q.    Okay.  So that it was -- although you

10   testified earlier that it was your understanding that it

11   was for the business pursuant to a conversation with your

12   husband, the money was actually loaned to the two of you?

13         A.    Right.

14         Q.    Okay.

15               MR. BITNER:  That's all I've got.  Thank you

16   very much.

17               (Deposition adjourned at 3:38 p.m.)

18

19

20

21

22

23

24

25

43

1  STATE OF OREGON              )

2                               )  ss

3  COUNTY OF MULTNOMAH          )

4

5      I, Heather M. Ingram, Certified Shorthand Reporter for

6  the State of Oregon, do hereby certify that CANDICE

7  EVANGELINE HOLMAN personally appeared before me at the time

8  and place mentioned in the caption herein; that the witness

9  was by me first duly sworn under oath and examined upon

10 oral interrogatories propounded by counsel; that said

11 examination, together with the testimony of said witness,

12 was taken down by me in stenotype and thereafter reduced to

13 typewriting; and, that the foregoing transcript, pages 1

14 through 42, both inclusive, constitutes a full, true and

15 accurate record of said examination of and testimony by

16 said witness, and of all other oral proceedings had during

17 the taking of said deposition, and of the whole thereof.

18     Witness my hand at Portland, Oregon, this 13th day of

19 July, 2015.

20

21     _____

22     Heather M. Ingram

23     Oregon CSR No. 93-0279

24     Washington CSR No. 2188

25

44

1                    DEPOSITION ERRATA SHEET

2    DWIGHT DANIELS, LAURA DANIELS,

3         vs.

4    JAMES JOEL HOLMAN,

5    CANDICE EVANGELINE HOLMAN,

6              DECLARATION UNDER PENALTY OF PERJURY

7         I declare under penalty of perjury that I have read
     the entire transcript of my Deposition taken in the
8    captioned matter or the same has been read to me, and
     the same is true and accurate, save and except for
9    changes and/or corrections, if any, as indicated by me on
     the DEPOSITION ERRATA SHEET hereof, with the understanding
10   that I offer these changes as if still under oath.

11        Signed on the _____ day of _____, 20__.

12   _____

13   Witness Name

14                  DEPOSITION ERRATA SHEET

15   Page No. _____ Line No. _____ Change to: _____

16   _____

17   Reason for Change: _____

18   Page No. _____ Line No. _____ Change to: _____

19   _____

20   Reason for Change: _____

21   Page No. _____ Line No. _____ Change to: _____

22   _____

23   Reason for Change: _____

24
     SIGNATURE: _____   DATE: _____
25              Witness Name