UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

*In re*

JAMES JOEL HOLMAN and CANDICE EVANGELINE HOLMAN,

Debtors.

Case No. 14-35381-rld7

---

DWIGHT and LAURA DANIELS, husband and wife,

Plaintiffs,

v.

JAMES JOEL HOLMAN and CANDICE EVANGELINE HOLMAN,

Defendants.

Adversary Proceeding No. 14-03285-rld

**CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE**

Comes now, Creditors/Plaintiffs Dwight Daniels and Laura Daniels ("the Daniels") and submit their Trial Memorandum.

The Daniels have brought claims, pursuant to 11 U.S.C. 523(a)(2)(A) and 523 (a)(2)(B) and Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure, requesting that the Court determine that specific financial obligations of debtors James Joel Holman and Candice Evangeline Holman ("the Holmans") are nondischargable. The (a)(2)(A) claim is against James Holman ("Mr. Holman") and the (a)(2)(B) claim is against both the Holmans.

////

////

Page 1 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

# I. LEGAL STANDARDS

Nondischargeability is a question of federal law, governed by the Bankruptcy Code. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). The creditor must prove the nondischargeability elements by a preponderance of the evidence. *Grogan,* 498 U.S. at 291.

In order to preclude a debtor's discharge based on 11 U.S.C. § 523(a)(2), a creditor must prove:

(1) the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *In re Kirsh*, 973 F.2d 1454, 1457 (9th Cir. 1992).

Subparts (A) and (B) of 11 U.S.C. §523(a)(2) are mutually exclusive. *Kirsh*, 973 F.2d at 1457. (A) refers to representations other than those respecting the debtor's financial condition, and (B) refers specifically to written statements of financial condition. *Kirsh*, 973 F.2d at 1457. In all other respects the sections are the same, and the elements apply the same. *In re Siriani*, 967 F.2d 302, 304 (9th Cir. 1992), *as amended* (June 29, 1992). Both subparts are at issue here.

## A. What Constitutes Knowledge of Falsity

The elements of intent and knowledge are often intertwined as the "scienter" requirement of a 11 U.S.C. § 523(a)(2) claim, especially so in the Ninth Circuit precedent. When determining the knowledge element,

> "[a] representation may be fraudulent, without knowledge of its falsity, if a person making it is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented. *In re Gertsch*, 237 B.R. 160 at 168 (9th Cir. BAP 1999)(quoting Restatement (Second) of Torts § 526 cmt. e (1977)(internal quotation marks omitted)). In such circumstances, the person makes the representation 'without [believing] in its truth or

Page 2 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

> recklessly, careless of whether it is true or false.' *In re Kong*, 239 B.R. 815 at 827 (9th Cir. BAP 1999)(quoting Restatement (Second) of Torts § 526 cmt. e)."

*In re Hirth*, No. ADV 11-00474, 2014 WL 7048395, at *11 (B.A.P. 9th Cir. Dec. 11, 2014) [unpublished opinion].

> "The scienter requirement for a fraudulent misrepresentation is established by showing 'either actual knowledge of the falsity of a statement, or reckless disregard for its truth....' *In re Houtman*, 568 F.2d 651, 656 (9th Cir.1978). Although *Houtman* was a case under § 17(a)(2) of the Bankruptcy Act of 1898, its statement of the law is here applicable, as the Act's intent elements were essentially identical to elements (3) and (4) of § 523(a)(2)(B), '(2) That at the time [debtor made the representations] he knew they were false; (3) That he made them with the intention and purpose of deceiving the creditor....'*Houtman*, 568 F.2d at 655."

*In re Gertsch*, 237 B.R. 160, 167 (B.A.P. 9th Cir. 1999).

Courts outside of the Ninth Circuit agree with the Circuit's analysis concerning what constitutes knowledge:

> In assessing a debtor's knowledge of the falsity of the representation, the court must consider the knowledge and experience of the debtor. *The Merchants Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (8th Cir. BAP 1999) (citing *In re Duggan*, 169 B.R. 318, 324 (Bankr. E.D.N.Y.1994)). A false representation made under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth and satisfies the knowledge requirement. *Id*."

*In re Glatt*, 315 B.R. 501, 509 (Bankr. D.N.D. 2004).

> "A false representation made under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth, and this satisfies the knowledge requirement." *Moen*, 238 B.R. at 791 (quoting *Duggan*, 169 B.R. 318, 324 (Bankr.E.D.N.Y.1994))."

*In re Cozart*, 417 B.R. 116, 126-27 (Bankr. W.D. Ark. 2009).

Page 3 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

In summary, direct knowledge of the falsity is not required. The party making the representation must have known or should have known of the falsity and acting in disregarding of the truth satisfies the requirement.

**B.    Reliance**

Turning to the fourth element of a 11 U.S.C. § 523(a)(2) claim, it requires the creditor to show he or she relied on the representations. In order to meet this element, a creditor must prove *justifiable reliance* upon the representations of the debtor. *In re Kirsh*, 973 F.2d 1454, 1460 (9th Cir. 1992). The court is to look to all of the circumstances surrounding the particular transaction, and must particularly consider the subjective effect of those circumstances upon the creditor. *Kirsh*, 973 F.2d at 1460.

## II.    FACTUAL BACKGROUND

This case revolves around a $300,000 loan made by the Daniels to the Holmans. In January 2011 the Daniels met with a mutual acquaintance of theirs and the Holmans. The Daniels had expressed a desire to invest capital into particular types of businesses and the acquaintance informed the Daniels that the Holman's business, Pacific Cargo Services ("PCS") that met the requisite criteria and put the Holmans and Daniels in contact with each other. After speaking with Mr. Holman as well as corresponding through a long string of emails, the Daniels agreed to look into loaning money to the Holmans. The Holmans then voluntarily forwarded a Personal Financial Statement to the Daniels listing Mr. Holman as the "applicant" and Mrs. Holman as the "co-applicant" for the loan and representing that as of February 2011, they had $325,000 equity in their home evidenced by $775,000 present market value and a $450,000 mortgage (Plaintiffs' Exhibit 2). The Holmans only possible purpose in forwarding that financial statement to the Daniels was to induce them to loan the money.

At this point in the discussion, the Daniels, relying upon the Personal Financial Statement, were leaning towards loaning the money to the Holmans. However, the terms of the

Page 4 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

loan and the security for the loan were still to be determined. The loan was to be for $300,000. The Holmans originally offered a twenty percent (20%) interest rate, real estate and the business as collateral through the UCC-1 Financing Statement. The Daniels believed that twenty percent (20%) was too high and decided that a ten percent (10%) interest rate would be fairer. Additionally, based on the financial statement, the Daniels decided that instead of using all of the Holmans' assets as collateral, they would protect themselves by utilizing the personal residence as security which was presented to them through the financial statement as having $325,000 of equity as well as the business assets through a UCC-1 Financing Statement. Additionally the Daniels asked Mr. Holman to assign a portion of his life insurance policy since he was the business and without him the business would fail.

The Daniels had never heard of a UCC-1 Financing Statement, that subject was brought up by Mr. Holman initially. During a telephone conversation with the Holmans, Mr. Daniels took written notes concerning the terms that were being agreed upon (Plaintiffs' Exhibit 5).

Therefore, the loan was purportedly secured in three ways: (1) through a Deed of Trust in Defendants' personal residence at 26280 Milk Creek Circle in Mulino, Oregon (Plaintiffs' Exhibit 4); (2) through Mr. Holman naming Dwight Daniels as a beneficiary in connection with a life insurance policy (Plaintiffs; Exhibit 8)); and (3) in the assets of PCS, evidenced through a UCC-1 Financing Statement (#8730073) identifying Dwight Daniels as the secured party and PCS as the debtor (Plaintiffs' Exhibit 6).

Both Mr. and Mrs. Holman signed a Secured Promissory Note on February 24, 2011 (Plaintiffs' Exhibit 3) and they both signed the Trust Deed dated February 25, 2011 (Plaintiffs' Exhibit 4). The UCC-1 Financing Statement was in fact filed by the Holmans and emailed to Mr. Daniels by Mr. Holman on February 25, 2011 (Plaintiff's Exhibit 7). It identified as security, "Inventory, Equipment, accounts receivable, deposit accounts, intangibles, general intangibles" (Plaintiffs' Exhibit 6).

Page 5 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Case 14-03285-rld    Doc 37    Filed 08/06/15

Despite the generous terms of the loan, the Holmans had difficulty making payments virtually immediately. The Daniels agreed to defer payments in 2011 and there were multiple missed payments in 2012. By early 2013 it was becoming clear that the business was having issues and in January 2013, PCS filed for bankruptcy under Chapter 11 (later converted to Chapter 7). Though Mr. Holman would periodically inform the Daniels of various problems with the business, it became clear that the business had problems from the outset of the relationship between the Holmans and the Daniels.

Though they were never informed of such by the Holmans, the Daniels became aware that the UCC-1 Financing Statement which listed all of the business assets as security for the $300,000 loan, had been canceled in August of 2011. The UCC-3 which terminated the UCC-1 Financing Statement filed as security for the Daniels, was filed on August 18, 2011 (Plaintiffs' Exhibit 12) and stated that Dwight Daniels had authorized the termination, a necessity because he was a Creditor. However, Mr. Daniels never authorized the termination of the UCC-1 Financing Statement. Mr. Daniels questioned Mr. Holman about that cancellation (Plaintiffs' Exhibit 12) and Mr. Holman feigned ignorance asking Mr. Holman when he had filed the UCC-1. Again, Mr. Holman was the impetus of the UCC-1 as Mr. Daniels had never even heard of a UCC-1 prior to meeting Mr. Holman. Through their own research, the Daniels also became aware that Mr. Holman had filed multiple UCC-1 Financing Statements, some on the exact same day as the one filed for the Daniels and that only the UCC-1 Financing Statement for the Daniels was terminated. Not one of the others had been terminated at any time (Plaintiffs' Exhibit 14).

It also became clear to Mr. Daniels that Mr. Holman had misrepresented the Holman's financial situation in the Personal Financial Statement he voluntarily sent the Daniels. In other words, the Holmans had induced the Daniels to loan them $300,000 based on misrepresentation and fraudulent statements within the Personal Financial Statement as well as through the use of a

Page 6 –   CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Case 14-03285-rld    Doc 37    Filed 08/06/15

UCC-1 Financing Statement that they in covertly terminated without covertly terminating the UCC-1 Financing Statement six (6) months later.

On September 23, 2014, the Holmans filed a Petition for Relief in the District of Oregon under Chapter 7 of the U.S. Bankruptcy Code.

### III. APPLICATION OF LAW TO FACTS

**A.    11 U.S.C. (a)(2)(A) - The UCC-1 Financing Statement**

The UCC-1 Financing Statement filed by Mr. Holman's attorney, Todd Mitchell, was a valid and binding security agreement. It meets all of the requirements of ORS 79.0502 and there is no record of any errors or omissions that would render the Statement seriously misleading. The Holmans have taken the position that because the promissory note did not reference the Financing Statement, that it is somehow invalid. That is not the case. Oregon law does not require a security agreement to make a UCC Financing Statement effective. To the contrary, ORS 79.0502(4) provides: "A financing statement may be filed before a security agreement is made or a security interest otherwise attaches." The Holmans have further posited that the Statement is somehow legally invalid because the terms of the loan changed. First of all, there is no evidence that the terms as described above ever changed. To the contrary, Mr. Daniels' handwritten notes concerning the terms of the loan establishes just the opposite. Regardless, the Financing Statement was filed and Mr. Holman was very well aware of that fact. So much so, he personally forwarded the UCC-1 Financing Statement to Mr. Daniels after he executed the promissory note and trust deed (Plaintiffs' Exhibit 7).

Regardless of the foregoing, Oregon law is clear on the procedure to use in terminating a UCC Financing Statement and who may do so. ORS 79.0513. Only a secured party may terminate a Financing Statement. *Id.* Otherwise, a person may file an information statement if that person believes that the record is wrong or the Statement was wrongfully filed. ORS 79.0518. No one filed an information statement; to the contrary, Mr. Holman forwarded Mr.

Page 7 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Daniels the filed UCC Financing Statement. Instead, the Holmans had their attorney covertly and wrongfully terminate the Financing Statement without the required consent.

Mr. Holmans' actions in causing the UCC-1 Financing Statement to be filed and then intentionally terminating the UCC-1 Financing Statement without Plaintiffs' knowledge and requisite consent also constitutes false pretenses, a false representation and actual fraud regarding information other than his financial condition. Mr. Holman raised the issue of using the UCC-1 to secure the loan to induce the Daniels to loan the Holmans the money and intended the Daniels to believe that the UCC-1 would remain in place. The Daniels justifiably relied on the existence of that financing statement at the time of the loan assured that they had additional security. The Financing Statement was then covertly terminated. There was no discussion between the Holmans and the Daniels that the Daniels did not require the security the UCC-1 statement offered. It was part of the basis of the loan. There certainly was no discussion about the termination of the financing statement as the Daniels did not even know it had been terminated until more than a year afterwards. Nonetheless, the UCC-3 terminating statement (Plaintiffs' Exhibit 12) states that Mr. Daniels consented to the termination. Had the Daniels have known that the UCC-1 Financing Statement was going to be terminated behind their backs, they never would have loaned the money and been damaged in the amount of $300,000.

### B. <u>11 U.S.C. 523 (a)(2)(B)</u> -The Personal Financial Statement

As noted above, the Personal Financial Statement identifying Mr. Holman as the "applicant" and Mrs. Holman as the "co-applicant" for the loan was sent directly to the Daniels by the Holmans. The only purpose for the statement was to induce the Daniels to loan the money. The Daniels justifiably relied upon the Personal Financial Statement to insure that there was enough money to secure the loan. For example, on page 2 of the Financial Statement (Plaintiffs' Exhibit 2) Mr. Holman filled out a section entitled "Real Estate Owned". This section included areas for present market value of the Holmans' homes as well as the original

Page 8 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

SLINDE NELSON STANFORD
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Case 14-03285-rld    Doc 37    Filed 08/06/15

cost, mortgages and mortgage balances. Under the primary residence section, the Holmans identified a residence in Molina, Oregon owned by both James and Candice Holman, the same residence that was used as security for the loan. The "present market value" was identified as $775,000. One mortgage holder was identified, Country Wide. The monthly payments were identified as $1,980 and the mortgage balance was identified as $450,000. In other words, Mr. Holman represented that the Holmans had equity of $325,000 in their primary residence. In reality, that was patently untrue.

Rather than just one mortgage, the Holmans had two (2) mortgages on the property, they had a much higher monthly payment and a higher mortgage balance. The Holmans have admitted that this information was wrong in their Amended Responses to Plaintiffs' Interrogatories (Plaintiffs' Exhibit 9) and through testimony. In their Amended Response to Plaintiffs' Interrogatories, the Holmans admitted that they had mortgages with Bank of America in the amount of $292,140 and a second mortgage with Cutting Edge Credit Union in the amount of $250,403. *Id.* In other words, there were mortgages in excess of $545,500. Mr. Holman testified that he did not look at a mortgage statement and just listed the number without any diligence. Additionally, Mr. Holman has admitted that that he did not know the market value of his home and in fact simply guessed based on a listing price, not a sale price, of a home across the street from his from years before (Plaintiffs' Exhibit 11). In fact, as of August 2013, an appraiser identified the Molina home as being worth approximately $510,000. Additionally, the evidence will show that the $775,000 was a gross exaggeration of the value of the home. In other words, the Holmans had nowhere near $325,000 in equity in their home, knew or should have known that and fraudulently misrepresented that equity to the Daniels in an effort to induce the Daniels to loan them $300,000.

In summary, the Personal Financial Statement offered by the Holmans to the Daniels contains material representations about the financial condition of the Defendants in February,

Page 9 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

2011 including in particular the amount of equity Defendants' allegedly had in their primary residence. The Holmans knew, or should have known, the falsity of these statements and acted in reckless disregard of the truth in the preparation of the Financial Statement. The Holmans intended the Daniels to rely on the misrepresentations in connection with the loan and induce the Daniels to make the loan through those representations, especially given the fact that the primary residence had already been discussed as collateral. The Daniels justifiably relied upon those representations and the Financial Statement and but for said representations, the Daniels would not have made the loan and have been damaged in the amount of $300,000.

**C.    Imputation of False Conduct**

The Holmans take the position that, because she did not prepare the statement and did not personally make any direct representations to the Daniels, she cannot be held liable for the misrepresentations, actions or omissions involved in the loan process. Mrs. Holman cannot separate herself so easily from this litigation. Unequivocally, Mrs. Holman signed the Promissory Note and the Deed of Trust which were part of the loan made by the Daniels to the Holmans. Moreover, she served as the corporate representative in acknowledging the assignment of the benefits of the life insurance policy as part of the collateral of the loan. Even though Mr. Holman prepared the Personal Financial Statement, Mrs. Holman should share in liability for the misrepresentations. Admittedly, the simple fact they are married is not enough by itself, but courts across the counry have identified factors that can weigh in favor of imputation. *La Trattoria, Inc. v. Lansford* (*In re Lansford*), 822 F.2d 902 (9th Cir.1987).

The Ninth Circuit has not approached the issue of imputation in the context of an 11 U.S.C. §523(a)(2)(B) claim. However, other circuits have. For example, bankruptcy courts in the Sixth and Eighth Circuit have held in cases under § 523(a)(2)(B) an agent's fraud cannot be imputed to the debtor without some showing that the debtor knew or should have known of the fraud. *In re Futscher*, 58 B.R. 14, 17 (Bankr.S.D.Ohio 1985); *In re Anderson*, 29 B.R. 184, 190-

Page 10 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

SLINDE NELSON STANFORD
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Case 14-03285-rld    Doc 37    Filed 08/06/15

91 (Bankr.N.D.Iowa 1983); *Matter of Walker*, 726 F.2d 452, 454 (8th Cir. 1984). In *Walker*, the court also held if the debtor was recklessly indifferent to the acts of his agent, then the fraud may also be attributable to the debtor-principal. 726 F.2d at 454.

An important factor courts have identified when deciding whether to impute liability from one spouse's fraudulent conduct to another "innocent spouse" on a §523(a) claim is if "a partnership or other agency relationship between spouses" existed. *In re Tsurukawa*, 258 B.R. 192, 198 (B.A.P. 9th Cir. 2001). If such a relationship is present, the debtor need not necessarily know of the fraud in order to be held liable. *Id*.

Generally, courts have imputed liability due to knowing participation where one partner commits fraud in the ordinary course of the partnership's business, and when the fraudulent conduct confers a financial benefit on the partner who did not participate directly in the fraudulent conduct. *In re Phong Van Tran*, No. 09-58710-ASW, 2014 WL 519202, at *8 (Bankr. N.D. Cal. Feb. 7, 2014) (citing *Strang v. Bradner*, 114 U.S. 555 (1885)).

Applying the above to the case at bar, Mrs. Holman testified that she is a partner with Mr. Holman in the various businesses and Mr. Holman testified that she was in fact a secretary of the company that holds PCS. She was involved in the loan process and enjoyed the benefits of the loan that was induced by the false representations. Additionally, she signed whatever her husband asked her to sign, acting in reckless indifference to the false representations.

Moreover, any representation made by the Holmans either through James Holman or Mrs. Holman was made on behalf of both Holmans as the loan was specifically made to both Holman Defendants, not just Mr. Holman. All the parties testified to that fact, including Mrs. Holman. Moreover, the Personal Financial Statement, given to the Plaintiffs by the Defendants which Plaintiffs allege includes numerous misrepresentations meant to induce Plaintiffs to loan the money, included Mrs. Holman as "a co-applicant" for the loan. Whether she took the time to review that personal financial statement is irrelevant. The statement, which includes her

Page 11 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

personal information, was made and shared on her behalf, as she admittedly knew that the loan was being made to both of them.

Mrs. Holman testified that she had no coversations regarding the Financial Statement but that she did not remember whether she had any conversations about the financial statement or not. She further testified that she had discussions with her husband about the security for the loan. In fact, Mrs. Holman testified that she just couldn't remember a lot about the loan transaction including conversations with the Daniels themselves.

Any action or omission taken by either of the Holmans in regards to the loan in question was taken on behalf of both of them, not just one of them and the Plaintiffs had every reason to believe that the statements and/or omissions of Mr. Holman were also those of Mrs. Holman and rely upon that very reasonable belief. By sending the Plaintiffs a financial statement listing Mrs. Holman as a "co-applicant", including her personal information and representing to the Plaintiffs that the loan was being made to both Mr. and Mrs. Holman via a promissory note and trust deed signed by both of them, both of the Daniels were engaging in conduct that held out Mr. Holman as his wife's agent and the Plaintiffs relied on the belief that the representations were made on behalf of both of the Holmans. In other words, James Holman was acting as an agent for his wife when he made any affirmative statement or misrepresentation, including, but not limited to, statements made in the financial statement and/or any actions taken by Mr. Holman concerning the UCC-1 financial statement. *See, Eads v. Borman,* 234 Or App 324 (2010); *Jennison v. Providence St. Vincent Med. Ctr.*, 174 Or App 219 (2001). Plaintiffs had every reason to believe that the information they were relying upon provided by Mr. Holman also came from his wife as well, where the statement is from both Mr. and Mrs. Holman as co-applicants..

Oregon courts have held that an agency between husband and wife "may be implied from attending circumstances, and the apparent relations and conduct of the parties." *Young v. Neill*, 220 P.2d 89, 94 (Or.1950) (citation omitted) (holding that the husband had implied authority to

Page 12 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Case 14-03285-rld    Doc 37    Filed 08/06/15

act on the wife's behalf based on a history of the wife permitting the husband to conduct joint business in his name only) adhered to on rehearing 225 P.2d 66 (Or.1950); *Hill v. Oland*, 655 P.2d 1088 (Or.App.1982) (Thorton, J., dissenting). "Where the issue is whether a husband was the agent of his wife, with the authority to act for her, evidence that he had previously acted for her in the same type of transaction is admissible." *Id*. (citations omitted). For example, in *In re Conduct of Carstens,* the Oregon Supreme Court held that a husband had implied authority to sign his wife's name to a certificate of title in light of evidence that established a prior course of similar conduct. 683 P.2d 992, 997 (Or.1984).

The course of conduct analysis has been utilized in cases similar to the case at bar. For example, in *Chase Bank USA, N.A. v. Comer,* No. 3:13-CV-01138-HA, 2014 WL 3729158 (D. Or. July 25, 2014), the court found a history of conduct in which the wife allowed the husband to handle the couple's business, including financing and followed that course with a loan in which the husband encumbered the wife's property. The court held that the husband had implied authority to encumber his wife's interest in the property noting the fact that Oregon courts imply agency between spouses based on course of conduct.

In this matter, Mrs. Holman has testified that she allows her husband to do all of the business and signs where he asks her to sign, without even reading the documents, even though she was his partner in the businesses. She also testified that her husband takes care of all of the finances. Defendant has not introduced any evidence that calls into question this course of conduct. Based on Oregon law, she cannot escape liability for allowing her husband to make representations on her behalf, in effecr acting in reckless indifference to the false representations. As an aside, the fact that she did not sign the financial statement is rendered moot as pursuant to her own testimony, Mrs. Holman routinely signs documents without reading them.

Other jurisdictions agree with Oregon's position.

> "[T]he fact that the wife has such knowledge of husband's activity on her property, in the light of other evidence, may be of strong

Page 13 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Case 14-03285-rld    Doc 37    Filed 08/06/15

> corroborative value. Owing to the close relationship existing between husband and wife, an agency by the husband may be created by slight circumstances. It is unnecessary that they enter into any formal contract of agency, nor is it necessary that the wife expressly state to her husband that she gives him authority to act. Such an agency may be inferred from the things said and acts done."

*Schulz v. Schulz*, 63 B.R. 168 (D. Neb. 1986).

Whether Mrs. Holman prepared, signed, or reviewed the financial statement or personally dealt with the UCC-1 or whether her husband took those actions upon himself is irrelevant. She cannot hide behind her claimed failure to read statements or documents prepared on her behalf. The statements and/or misrepresentations were made on behalf of both Holmans. Therefore, she shares the same responsibility and liability from the representations, actions, and/or omissions as her husband and agent, James Holman.

Mrs. Holman was involved in the loan process, she enjoyed the benefits of the loan, acted in reckless disregard of even the possibility of false representations and she was a partner with her husband in the very business the loan was for. Any false representations made were made on behalf of both Holmans and should be imputed to both.

### IV. CONCLUSION

As a result of the misrepresentations, false pretenses and actual fraud, the Daniels have suffered damages including but not limited to the $300,000 loan and all applicable interest and fees under that loan. Those damages are not dischargeable under 11 USC § 523(a)(2)(A) and 523(a)(2)(B).

### V. MOTIONS IN LIMINE

Creditors/Plaintiffs hereby submit the following Motions in Limine to exclude or admit evidence as follows:

**A. MOTION I. Allowing Plaintiffs' attorney to refer to exhibits during opening statement.**

Page 14 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

1 Plaintiffs seek an order allowing Plaintiffs' attorney to refer to several trial exhibits during the opening statement.

**B. MOTION II. Excluding any documents or offers of settlement in accordance with FRE 408.**

Plaintiffs seek an order excluding documents produced by Plaintiffs pursuant to FRE 408 as Confidential Settlement Communications.

**C. MOTION III. Admit expert testimony of all information used by experts in formulation of opinions.**

Plaintiffs seek an order allowing admission of expert testimony as to all information used and relied upon by their experts in formulation of their opinions. This includes all information relied upon by the experts, including all facts, data, and documents relied upon in formulation of their opinions and reports regardless of whether the underlying facts, data or documents are otherwise inadmissible under the Federal Rules of Evidence. The rules specifically state R that where the experts is required to testify as to the basis of the opinion, such facts or data "need not be admissible in evidence." FRE 703. Furthermore, such facts, data, documents, etc. that form the basis of expert opinion are used in a regular coarse of business to formulate such opinions and routinely relied upon by experts of this nature in these types of cases. Such evidence is highly relevant to the expert's opinions and must be allowed to evaluate those opinions.

**D. MOTION IV. Permitting the use of deposition testimony pursuant to FRCP 32.**

**E. MOTION V. Taking judicial notice of the Oregon Secretary of State website.**

Plaintiffs intend on entering printouts from the Oregon Secretary of State's website as a composite exhibit (Plaintiffs' Exhibit 15), specifically concerning a UCC search of financing statements filed on behalf of defendants' various companies. Pursuant to FRE 201, Plaintiffs request the Court to take judicial notice of the validity of the website and printouts therefrom.

Page 15 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

SLINDE NELSON STANFORD
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Case 14-03285-rld    Doc 37    Filed 08/06/15

**F.  MOTION VI.  Taking judicial notice of the fact that the UCC-3 was requested and filed by Ater Wynne.**

Plaintiffs subpoenaed Unisearch, a financial compliance company, for all documents regarding the termination of the UCC-1 Financing Statement at issue in this matter.  Plaintiffs intend on entering the responsive production from that subpoena which includes correspondence between Unisearch and the law office of Ater Wynne concerning the request to file the UCC-3 terminating the Financing Statement as a composite exhibit (Plaintiffs' Exhibit 16).  Pursuant to FRE 201, Plaintiffs request the Court to take judicial notice of the fact that the request for the termination came from Ater Wynne.

**G.  MOTION VII.  Taking judicial notice of Todd Mitchell's employment with Ater Wynne as of 2011.**

Pursuant to FRE 201, Plaintiffs request the Court to take judicial notice of the fact that Todd Mitchell was working at Ater Wynne as of 2011.  Plaintiffs have attached to the Declaration of R. Hunter Bitner, II a print out from Ater Wynne's website identifying when Mr. Mitchell began employment with Ater Wynne.

DATED: August 6, 2015.

SLINDE NELSON STANFORD

By: _/s/ R. Hunter Bitner II_____
    Darian A. Stanford, OSB No. 994491
    R. Hunter Bitner, II, OSB No. 011146
    *Of Attorneys for Dwight and Laura Daniels*

Page 16 – CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250

Case 14-03285-rld    Doc 37    Filed 08/06/15

# CERTIFICATE OF SERVICE

I hereby certify that I served the attached **CREDITORS'/PLAINTIFFS' TRIAL MEMORANDUM AND MOTIONS IN LIMINE** on the following person(s) on the date indicated below:

> Paul B. Heatherman
> Law Offices of Paul Heatherman PC
> 250 NW Franklin Ave, #402
> Bend, OR 97701
> *Of Attorneys for Debtors-Defendants*

By the following indicated method(s):

☐ By **emailing** full, true, and correct copies thereof to say attorney to the email address noted above, which is the last known email address for said attorney, on the date set forth below.

☒ By notice of electronic filing using the PACER ECF filing system.

☐ By causing full, true and correct copies thereof to be **mailed** to the attorney(s) at the attorney(s) last-known office address (as) listed above on the date set forth below.

DATED: August 6, 2015.

SLINDE NELSON STANFORD

By: /s/ R. Hunter Bitner II
    Darian A. Stanford, OSB No. 994491
    R. Hunter Bitner II, OSB No. 011146
    *Of Attorneys for Dwight and Laura Daniels*

Page 17 – CERTIFICATE OF SERVICE

**SLINDE NELSON STANFORD**
111 SW 5th Avenue, Suite 1940
Portland, Oregon 97204
p. 503.417.7777; f. 503.417.4250