Below is an Opinion of the Court.

_____
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re: )
) Bankruptcy Case
James Joel Holman and Candice )
Evangeline Holman, ) No. 14-35381-rld7
)
                    Debtors. )
_____)
)
Dwight and Laura Daniels, )
husband and wife, ) Adversary Proceeding
) No 14-03285-rld
                      Plaintiffs, )
)
    v. ) MEMORANDUM OPINION
)
James Joel Holman and Candice )
Evangeline Holman, )
)
                      Defendants. )

This adversary proceeding ("Adversary Proceeding") was tried before me (the "Trial") on Thursday, August 13, 2015. The plaintiffs, Dwight and Laura Daniels (the "Daniels"), asserted exception to discharge claims against the debtor defendants, James and Candice Holman (the "Holmans"), under 11 U.S.C. §§ 523(a)(2)(A) – fraud, and 523(a)(2)(B) –

Page 1 - MEMORANDUM OPINION

false financial statement.[1] Prior to the Trial, I granted partial summary judgment in favor of Mrs. Holman on the Daniels' § 523(a)(2)(A) claim but reserved judgment on their § 523(a)(2)(B) claim against her.

During the Trial, I listened carefully to witness testimony and the arguments of counsel. Following the Trial, I have reviewed my notes from the Trial, the admitted exhibits and the parties' Trial memoranda. I further have taken judicial notice of relevant entries on the docket and documents filed in the Adversary Proceeding and in the Holmans' main chapter 7 case for the purposes of confirming and ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; In re Butts, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). I have considered the testimony and arguments presented by the parties. In addition, I have reviewed relevant authorities, both as cited to me by counsel for the parties and as located through my own research.

Based on that review and consideration, I have come to a decision. The findings of fact and conclusions of law stated in this Memorandum Opinion constitute my findings and conclusions for purposes of Fed. R. Civ. P. 52(a), applicable in this Adversary Proceeding under Fed. R. Bankr. P. 7052.

## Facts from the Evidence

Mr. Daniels comes from a background of 25-30 years in the insurance business. Mrs. Daniels has worked as an escrow officer but never has been an owner, officer or loan officer with a bank.

---

[1] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532. The Oregon Revised Statutes (2013) are referred to as "ORS."

Page 2 - MEMORANDUM OPINION

In early 2011, Dwight Daniels was introduced to James Holman by a mutual friend. The Daniels had funds that they wished to invest, and the Holmans apparently owned a business that met the Daniels' criteria for investment. The parties had never met before they interacted in the transaction that is the subject of this Adversary Proceeding.

Mr. Daniels' understanding was that the Holmans' business, Pacific Courier Services, LLC ("PCS"), was in a cash crunch and needed loan funds "to get [the business] over the hump." There was some wrangling with respect to Mr. Holman's testimony, both at Trial and in his deposition, as to whether PCS was in "financial distress" in early 2011. However, Mr. Daniels testified, without contradiction, as to his understanding that the proceeds from the loan the Daniels were being asked to make were going to be used for operating expenses, including business payroll, among other things. At or about the time that the loan transaction closed, Mr. Holman emailed Mr. Daniels requesting to know when a wire transfer was being made "so I can immediately transfer to PCS . . . thanks for understanding and time is of the essence to some degree." See Exhibit 1, at 1. In these circumstances, I find that Mr. Holman's business had a need for funds that was at least pressing.

In any event, loan negotiations proceeded fairly quickly by telephone and email between Mr. Holman and Mr. Daniels. The agreed loan amount was $300,000 ("Loan"). Mr. Holman apparently offered to pay interest of as high as 15-20% on the Loan, but the Daniels felt those rates were "too high" and ultimately agreed on 10% interest. See Exhibit 3; Exhibit 14, at 2. Exhibit 3 is a copy of Mr. Daniels' hand-written notes setting forth the terms of the proposed Loan as he understood them.

Page 3 - MEMORANDUM OPINION

The Loan would be paid "interest only" for three years, at the end of which term, the Loan would be payable in full. The Daniels would retain "2 Points" ($6,000) and send funds to the Holmans in the amount of $294,000, although interest would accrue on the entire $300,000 Loan amount. No prepayment penalty would apply. As security for repayment of the Loan, the Holmans would provide the Daniels with a trust deed on their home, an assignment of $300,000 business life insurance on Mr. Holman, and a UCC filing on business assets. (Mr. Daniels indicated both in his notes and in his testimony that he had no familiarity with what a UCC-1 financing statement was or what it did.) See Exhibit 3.

At some point during the negotiations, Mr. Holman submitted an unsigned personal financial statement ("Financial Statement") to Mr. Daniels for himself and his wife. See Exhibit 2. It is not clear exactly when the Financial Statement was sent to Mr. Daniels, but it is dated as of February 1, 2011. See Exhibit 2, at 1. The balance sheet in the Financial Statement states that the Holmans had assets with a total value of $6,814,500 and liabilities totaling $866,000, for a net worth of $5,948,500. Id. Of particular note in the balance sheet is the valuation of the closely held business at $5,000,000. Mr. Holman testified that $5,000,000 represented the gross value of the business. Yet, none of the liabilities of the business were included on the liabilities side of the balance sheet. Id. On page 2 of the Financial Statement, the Holmans' home was valued at $775,000, with a mortgage balance of $450,000, reflecting equity of $325,000. See Exhibit 2, at 2. Mr. Holman's testimony confirmed that he reviewed and made arrangements to pay the family's bills and mortgage statements. Mr. Holman also

Page 4 - MEMORANDUM OPINION

prepared the Financial Statement and sent it to Mr. Daniels without any input from Mrs. Holman.  Mrs. Holman testified that she was not aware of the Financial Statement and did not believe that she saw it before it was sent to Mr. Daniels.  She also testified that she did not recall any conversation with Mr. Holman about the Financial Statement.

The Daniels both testified that they reviewed the Financial Statement before deciding to make the Loan and relied on the Financial Statement in making their Loan decision.  Mr. Daniels specifically testified that the Daniels would not have made the Loan if they had known that the figures on page 2 of the Financial Statement with respect to the value of the Holmans' residence versus the mortgage balance on it were inaccurate.

The Loan closed on or about the end of February 2011 and was documented by a promissory note ("Note"); a deed of trust ("Trust Deed") on the Holmans' residence property; a UCC-1 ("UCC-1") filing with the Oregon Secretary of State's office; and an Assignment of Life Insurance Policy ("Insurance Assignment").  See Exhibits 4, 5, 6 and 8.  Consistent with the terms discussed between Mr. Daniels and Mr. Holman, the Note, dated February 24, 2011, is in the principal amount of $300,000, with a loan fee of $6,000, and bears interest at 10% per annum.  Payments were to be made interest only for 36 months, with repayment of the entire Note balance due in full on April 1, 2014.  See Exhibit 4, at 1.  The Trust Deed, the only security expressly referenced in the Note (see Exhibit 4, at 2), was recorded on February 28, 2011.  Both the Note and the Trust Deed were signed individually by Mr. and Mrs. Holman.  However, Mrs. Holman testified that she did not remember any discussion about the terms

Page 5 - MEMORANDUM OPINION

of the Loan, and she did not speak to either of the Daniels prior to the Loan being made.

The UCC-1, identifying PCS as the debtor, was filed with the Oregon Secretary of State's office on February 25, 2011. See Exhibit 6, at 1-2. The UCC-1 covered the following PCS collateral: "Inventory, Equipment, accounts receivables, deposit accounts, intangibles, general intangibles." See Exhibit 6, at 2. Apparently, the UCC-1 was filed by Todd Mitchell, whose law firm represented Mr. Holman's business. See id. The Insurance Assignment is dated August 8, 2011, and is signed by Mr. Holman and by Mrs. Holman as "Secretary of Integrity Transport Group." See Exhibit 8, at 1-2.

At approximately the time the Loan was funded, Mr. Holman provided a title insurance policy ("Title Insurance Policy") for the Holmans' residence to the Daniels. See Exhibit J. The Title Insurance Policy reflects two recorded deeds of trust on the residence property for loans in original principal amounts of $326,000 (dating from 2004) and $258,000 (dating from 2005). See Exhibit J, at 5-6.

Mr. Daniel testified that he arranged to send the Loan funds to the Holmans on February 28, 2011. Thereafter, the Holmans began making interest payments on the Loan. The parties' testimony is consistent that over time, the Holmans made at least 6 payments on the Loan obligation and did not ask for a deferral of any payments until August 2011. However, after the 60-day deferral period passed, the Holmans made only a few sporadic payments to the Daniels. Apparently, the last interest check received by the Daniels from the Holmans was in October 2012. See Exhibit 14, at 2.

Page 6 - MEMORANDUM OPINION

In the meantime, unbeknownst to the Daniels, on August 18, 2011, the UCC-1 was terminated. See Exhibit 9. Although the termination statement indicated that it was authorized by Mr. Daniels, he testified, consistent with the documentary evidence, that he knew nothing about the termination at the time. See Exhibit 9; Exhibit 13, at 3-4; Exhibit 14, at 2. Apparently, secured loans were made to PCS by AT&T Capital Services, Inc. and Greystone Capital in the fall of 2011 after the UCC-1 was terminated. See Exhibit 15, at 3-6. While Mr. Holman consistently has denied any knowledge as to who authorized the UCC-1 to be terminated, the evidence submitted tends to indicate that the UCC-1 was terminated by counsel for PCS. See Exhibit 10; Exhibit 11, at 2; Exhibit 12, at 1; Exhibit 16.

Ultimately, PCS was liquidated in bankruptcy. The insurance covered by the Insurance Assignment apparently evaporated with it. In any event, the Insurance Assignment no longer is available as collateral for the Loan. The Holmans followed PCS into chapter 7 bankruptcy on September 23, 2014. Main Case Docket No. 1. They scheduled the Daniels as undersecured creditors on their Schedule D with a third trust deed secured interest in their residence property valued at $25,000. See Main Case Docket No. 11. The Daniels filed the Adversary Proceeding timely on December 29, 2014. See Main Case Docket No. 43.

## Jurisdiction

I have jurisdiction to decide the claims at issue in this Adversary Proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(I).

## Discussion

### A. Motions in Limine

In Creditors'/Plaintiffs Trial Memorandum and Motions in Limine ("Plaintiffs' Trial Memorandum"), the Daniels included a number of motions in limine that, for the most part, were noncontroversial or agreeable to the Holmans. However, the motions included two requests that I take judicial notice on which I did not explicitly rule at the Trial: 1) that the UCC-1 termination statement was requested and filed by the Ater Wynne law firm; and 2) that Todd Mitchell was employed with Ater Wynne as of 2011. I decline to take judicial notice of those asserted facts as they are not relevant to my findings and conclusions in this case.

### B. Exceptions to Discharge Generally

Because it is a fundamental policy objective of the Bankruptcy Code to provide a fresh start to beleaguered debtors through a discharge of their debts, it is settled in the Ninth Circuit as elsewhere that the statutory exceptions to discharge are to be construed narrowly in favor of the debtors. See, e.g., Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992). That principle informs my consideration of the factual evidence and analysis of applicable legal authorities in this case.

### C. Section 523(a)(2)(A) – Fraud

Section 523(a)(2)(A) excepts from a debtor's discharge debts for money obtained by "false pretenses, a false representation or actual fraud." The elements of an exception to discharge claim under § 523(a)(2)(A) are:

Page 8 - MEMORANDUM OPINION

> (1) the debtor made a representation, or omitted to state a material fact(s) to the creditor;
> (2) at the time that the subject representation or omission was made, the debtor knew that the representation was false, or knew that the omission created a false statement, and the debtor was under a duty to disclose the omitted information;
> (3) the debtor made the subject representation or omission with the intention of deceiving the creditor;
> (4) the creditor justifiably relied; and
> (5) the creditor sustained damages as the proximate result of the representation or omission having been made.

See, e.g., Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 n.4 (9th Cir. 2001); Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000). The creditor bears the burden of proof on each of these elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286-91 (1991); First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986). However, fraudulent intent can be established through the presentation of circumstantial evidence. See, e.g., In re Adeeb, 787 F.2d at 1343; Devers v. Bank of Sheridan, Mont. (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985); and In re Johnson, 68 B.R. 193, 198 (Bankr. D. Or. 1986).

During argument at the Trial, I confirmed with the Daniels' counsel that the alleged misrepresentation upon which they based their § 523(a)(2)(A) claim was the representation by Mr. Holman that repayment of the Loan would be secured in part by the UCC-1 on business assets. The Daniels' argument is the offer of the UCC-1 as security was fraudulent or illusory in light of the subsequent termination of the UCC-1 without the Daniels' authorization or consent.

In light of the evidence presented, I conclude in favor of Mr. Holman on the Daniels' § 523(a)(2)(A) claim for the following reasons.

Page 9 - MEMORANDUM OPINION

First, the UCC-1, at least initially, was granted to the Daniels as purported security for repayment of the Loan. It was filed with the Oregon Secretary of State's office on February 25, 2011, and by its terms, it covered PCS's inventory, equipment, accounts receivable, deposit accounts, intangibles and general intangibles. Thereafter, until August 2011, the Holmans made payments on the Loan on the terms specified in the Note. The termination of the UCC-1 occurred in August 2011. It may or may not be coincidence that termination of the UCC-1 occurred at approximately the same time that the Holmans first asked the Daniels for deferral of their payment obligations under the Note. However suspicious the circumstances of the unauthorized termination of the UCC-1, the evidence does not establish that Mr. Holman intended to terminate the UCC-1 and default on the Loan payments at the outset of the Loan transaction.

Second, the evidence presented tends to indicate that the negotiations leading up to the Loan through the documentation of the Loan transaction could be characterized as "the blind leading the blind" as to the UCC-1. Although by the time of the Trial, Mr. Holman's testimony reflected a rudimentary understanding as to how security interests were created and worked, he testified that he thought the UCC-1 was valid when it was filed. The Daniels both testified that they knew nothing about UCC's at the time that they agreed to make the Loan. In his handwritten notes setting forth proposed Loan terms, Mr. Daniels refers to "UCC" with the notation "no familiarity with." See Exhibit 3. I generally found the testimony of all of the parties at Trial to be credible, although I have some questions about Mr. Holman's testimony with respect to

Page 10 - MEMORANDUM OPINION

termination of the UCC-1.

Finally, and perhaps most importantly, I cannot find from the evidence presented that the Daniels justifiably relied on the promise of Mr. Holman to provide the UCC-1 as security for repayment of the Loan. Since the Supreme Court's decision in Field v. Mans, 516 U.S. 59 (1995), "justifiable reliance" is recognized as an intermediate standard between the objective, "reasonable person" standard under § 523(a)(2)(B) and unqualified acceptance of whatever is communicated.

> Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.

Id. at 71, quoting the Restatement (Second) of Torts (1976), § 545A, Comment b.

> A person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized the opportunity to make a cursory examination or investigation."

Id., quoting the Restatement (Second) of Torts (1976), § 541, Comment a. See Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh), 973 F.2d 1454, 1460 (9th Cir. 1992) (In determining the issue of justifiable reliance, "the court must look to all of the circumstances surrounding the particular transaction, and must particularly consider the subjective effect of those circumstances upon the creditor.").

In this case, the Daniels have freely admitted that when Mr. Holman offered them a UCC-1 as partial security for repayment of the Loan, they had no idea what a UCC-1 was or how it worked. A cursory investigation would have revealed to them that two steps generally are

Page 11 - MEMORANDUM OPINION

required to create a security interest in personal property assets under the Uniform Commercial Code, in Oregon as elsewhere: 1) A security interest attaches when a debtor has signed a security agreement that grants a security interest in the subject collateral (see, e.g., ORS § 79.0203(1) and (2)(c)(A)); and 2) the security interest is perfected by filing a UCC-1 statement with the Oregon Secretary of State's office (see, e.g., ORS §§ 79.0310 and 79.0501(b)). The Daniels likewise would have been able to determine that if they made the Loan to the Holmans personally (as they did), the grant of a security interest in their favor by PCS might not be enforceable, as not supported by consideration. Further, they would have been able to determine that the priority of secured interests is determined in part by the order and timing of filing of UCC-1 statements (see, e.g., ORS § 79.0317(b)(B)), and if they conducted a UCC search, they might find that there was limited or no value of PCS assets available to secure repayment of the Loan in light of prior perfected security interests. However, they took none of these steps to ascertain whether the filing of the UCC-1 provided them with any real security for repayment of the Loan. In these circumstances, I cannot find that the Daniels justifiably relied on Mr. Holman's offer of the UCC-1 as security.

Accordingly, I cannot conclude in favor of the Daniels on their § 523(a)(2)(A) claim against Mr. Holman.

D. Section 523(a)(2)(B) – False Financial Statement

Section 523(a)(2)(B) excepts from discharge debts arising from the debtor's intentional use of a false financial statement on which the creditor reasonably relied. The elements to establish an exception to

Page 12 - MEMORANDUM OPINION

discharge under § 523(a)(2)(B) are:

    (1) the debtor made a representation of fact in writing;
    (2) the representation was material;
    (3) the debtor knew at the time that the representation was false;
    (4) the debtor made the representation with the intention of deceiving the creditor;
    (5) the creditor relied on the representation;
    (6) the creditor's reliance was reasonable; and
    (7) damages proximately resulted from the representation.

Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani), 967 F.2d 302, 304 (9th Cir. 1992) (citations omitted). Of particular relevance in this case, to establish the "intent to deceive" element, the creditor must show by a preponderance of the evidence "that the debtor's alleged false statement in writing was either knowingly false or made so recklessly as to warrant a finding that the debtor acted fraudulently." 4 Collier on Bankruptcy ¶ 523.08[2][e][ii] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.), citing Insurance Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1118-19 (3d Cir. 1995); Investors Credit Corp. v. Batie (In re Batie), 995 F.2d 85, 90 (6th Cir. 1993); Bank One Lexington v. Woolum (In re Woolum), 979 F.2d 71, 73 (6th Cir. 1992), cert. denied, 507 U.S. 1005 (1993); Driggs v. Black (In re Black), 787 F.2d 503, 506 (10th Cir. 1986). See Barlaam v. Financial Services Vehicle Trust (In re Barlaam), 2014 WL 3398381 (9th Cir. BAP July 11, 2014) ("Besides serving to impute the knowledge of falsity, a finding that a debtor acted with gross *recklessness* satisfies the element of intentional deception in § 523(a)(2)(B)(iv).") (emphasis in original and citations omitted). As with § 523(a)(2)(A), the creditor bears the burden of proof by a preponderance of the evidence to establish each of the § 523(a)(2)(B)

Page 13 - MEMORANDUM OPINION

elements. Grogan v. Garner, 498 U.S. at 286-91.

At the outset, the Financial Statement made a number of written representations as to the Holmans' financial situation in February 2011. The representations as to the Holmans' net worth and the values of their real estate holdings and the encumbrances against them in the Financial Statement were material. The Daniels relied on the information included in the Financial Statement in deciding to make the Loan, and when the Holmans could not repay the Loan, damages resulted to the Daniels from their reliance on the representations in the Financial Statement. Accordingly, I find that elements (1), (2), (5) and (7) have been satisfied.

Mr. Daniels testified that he had no reason not to believe the information in the Financial Statement was accurate. Mr. Holman had been introduced to him by a respected friend as a legitimate businessman looking for loan financing. Mr. Holman freely submitted the Financial Statement as an inducement to the Daniels to make the Loan, without prodding. The Financial Statement stated that the Holmans had a net worth of $5,948,500, providing an abundance of reasons to believe that the Holmans had the resources to repay a loan of $300,000. I find in these circumstances that the Daniels' reliance on the representations in the Financial Statement was reasonable, satisfying element (6).

That leaves elements (3) and (4), whether the Holmans knew that the representations in the Financial Statement were false when it was submitted to the Daniels or that the representations were so recklessly made as to satisfy that standard, and whether those representations were made with the intent to deceive the Daniels. It is a truism (Perry Mason

Page 14 - MEMORANDUM OPINION

aside) that parties virtually never admit at trial that they acted with an intent to deceive or defraud the opposing party. "We acknowledge that because a debtor will rarely, if ever, admit that deception was his purpose, this fourth element of § 523(a)(2)(B) is extremely difficult for a creditor to prove by direct evidence." In re Cohn, 54 F.3d at 1118. "Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case." In re Devers, 759 F.2d at 754.

On these elements, the paths of Mr. and Mrs. Holman diverge. Mr. Holman prepared the Financial Statement without any input from his wife, and he sent the Financial Statement to Mr. Daniels without discussing it with his wife. Neither of the Holmans signed the Financial statement, even though it was submitted in both their names. Mrs. Holman testified that she was not aware of the Financial Statement at the time it was sent to Mr. Daniels.

While the testimony at Trial focused on the market value for the Holmans' residence and the mortgage balance against it stated in the Financial Statement, the information included in the Financial Statement suffers from a much more fundamental inaccuracy. In the balance sheet on the first page of the Financial Statement, Mr. Holman valued his closely held business at $5,000,000. One ordinarily would assume in a net worth calculation that the $5,000,000 value without any corresponding liabilities included in the balance sheet represented equity value. However, Mr. Holman testified that the $5,000,000 value represented the gross value of his business. And he testified that he arrived at that figure from an appraisal for the business that he obtained one or two

Page 15 - MEMORANDUM OPINION

years earlier at $4.1-$4.2 million.  I don't question in general the logic of assuming that the value of an expanding business might have increased over time, but not to include the liabilities of the business on the opposite side of the ledger from the estimated gross value was grossly misleading.  From the Financial Statement, the Daniels were given the representation that repayment of their proposed $300,000 Loan was not an issue because on the first page of the Financial Statement, they were told that almost $6,000,000 of net worth protected them.  As an experienced businessman, Mr. Holman had to know better.

      I have given Mr. Holman the benefit of the doubt as to his lack of knowledge of what giving a UCC-1 as security meant in this transaction.  As a layman, even with substantial business experience, I do not assume that he had a working knowledge of the requirements to create a security interest under Article 9 of the Uniform Commercial Code.  However, he is entitled to no such benefit with respect to the balance sheet he prepared in the Financial Statement.  By its terms, a "balance sheet" sets forth a person or entity's assets v. liabilities to arrive at net worth.  Based on his experience as a business owner, Mr. Holman had to know that including the value for his business that he did on the Financial Statement without including its corresponding liabilities grossly overstated the net value of his business, resulting in a very material overstatement of the Holmans' net worth.  I find that driven by his need to close a loan transaction quickly with the Daniels, he was inexcusably reckless in including the value for his business that he used in the Financial Statement.  The circumstances supporting that finding include that Mr. Holman apparently had exhausted his

Page 16 - MEMORANDUM OPINION

possibilities for obtaining more conventional financing for PCS. If he had not, why would he be approaching private lenders like the Daniels and offering them "hard money" rates of interest? In addition, in these circumstances, it is reasonable to assume that PCS already had borrowed what it could from more conventional sources, but none of those obligations are reflected on the Financial Statement balance sheet. Mr. Holman had a pressing need for funds for his business, and he put the Financial Statement together and submitted it with reckless indifference to the truth of the numbers he presented in it to induce the Daniels to make a lending decision quickly in his favor. It was Mr. Holman who communicated to Mr. Daniels that "time was of the essence."

The value for and mortgage balance against the Holmans' home stated on page 2 of the Financial Statement reinforce the point: I find Mr. Holman essentially credible in his overly optimistic valuation of the home based on the listing price for the property across the street and his testimony about improvements to the home that had been made. However, his statement that the "mortgage balance" was $450,000, when the trust deed balances owed at the time actually totaled over $542,000 (see Exhibit 10, Response to Interrogatory No. 6), was recklessly indifferent to the truth when he had ready access to the current monthly statements as the person responsible for paying the bills.

Ultimately, I find that the Financial Statement prepared and submitted to the Daniels by Mr. Holman included net worth and home equity values that were grossly and recklessly inflated to induce the Daniels to arrive at a quick decision to make the Loan to the Holmans. In these circumstances, I conclude that elements (3) and (4) are satisfied as to

Page 17 - MEMORANDUM OPINION

Mr. Holman, and the Daniels are entitled to a judgment against him on their § 523(a)(2)(B) claim.

My conclusion is the opposite as to Mrs. Holman. She had nothing to do with the preparation of the Financial Statement. At the time, she was unaware that it was being prepared for submission to the Daniels. She never discussed it with Mr. Holman prior to its being presented, and there is no evidence that she knew that it was sent to the Daniels. She certainly did not discuss the representations in the Financial Statement with the Daniels at any point in time. She did not benefit personally from the Loan transaction, and the record is consistent that, for better or worse, she had no role in the financial transactions of the Holman family. I find in favor of Ms. Holman on the Daniels' § 523(a)(2)(B) claim. See, e.g., Sachan v. Huh (In re Huh), 506 B.R. 257 (9th Cir. BAP 2014)(en banc).

## Conclusion

Based on the foregoing findings, analysis and conclusions, Mr. Holman is entitled to a judgment in his favor on the Daniels' § 523(a)(2)(A) claim against him; the Daniels are entitled to a judgment in their favor against Mr. Holman on their § 523(a)(2)(B) claim against him; and Mrs. Holman is entitled to judgment in her favor on the Daniels' § 523(a)(2)(B) claim against her. A Judgment consistent with this Memorandum Decision will be issued contemporaneously.

# # #

cc:  R Hunter Bitner, III
     Darian Stanford
     Paul B Heatherman

Page 18 - MEMORANDUM OPINION